**Robert FORD, Etc., Plaintiff,**

v.

**Donna SHALALA, Secretary of the United States Department of Health and Human Services, Defendant.**

**No. CV–94–2736CPSSMG.**

United States District Court,
E.D. New York.

Sept. 29, 1999.

Peter Vollmer, Vollmer & Tank, Uniondale, NY, Whitney North Seymour, Jr., Craig A. Landy, Landy & Seymour, Christopher James Bowes, Jill Ann Boskey, Center for Disability Advocacy, New York, NY, for Plaintiff and Plaintiff–Intervenors.

Loretta E. Lynch, Acting United States Attorney, Eastern District of New York, By Kathleen A. Mahoney, Assistant United States Attorney, for Defendant.

## MEMORANDUM DECISION AND ORDER

SIFTON, Chief Judge.

This is an action brought by plaintiff, Robert Ford, individually and on behalf of all others similarly situated, against defendant Secretary of the United States Department of Health and Human Services ("HHS"),[1] alleging due process violations due to inadequacies in written notices to

---

1. On March 31, 1995, the division of HHS responsible for administering SSI, the Social Security Administration ("SSA") became a separate administrative agency.

Supplemental Security Income Program ("SSI") beneficiaries and equal protection violations said to be the result of defendant's failure to promulgate regulations requiring that SSI beneficiaries receive information in their benefit notices equivalent to that received by beneficiaries of other federal entitlement programs. The matter was tried before the undersigned sitting without a jury. For the reasons set forth below, I conclude that defendant's current notices are constitutionally defective because they violate plaintiffs' rights to due process of law. What follows sets forth the findings of fact and conclusions of law on which this determination is based, as required by Fed.R.Civ.P. 52(a). Plaintiffs' claim that defendant's notices violate plaintiffs' equal protection rights is dismissed because a rational basis exists that distinguishes the differences between the notices at issue.

## BACKGROUND

The SSI program was created by Congress in 1972 to provide a national program, administered by the Social Security Administration ("SSA"), to provide supplemental security income to individuals who have attained the age of 65 or are blind or disabled. *See* 42 U.S.C. § 1381. The SSI program replaced various state programs providing assistance to the aged, blind, and disabled ("AABD"). *See* Pub.L. No. 92–603 § 303(b).

In order to be entitled to benefits, applicants for SSI must show (1) their "categorical" eligibility, i.e., their status within the statutory categories of aged, blind, or disabled, and (2) their financial eligibility. *See* 42 U.S.C. §§ 1382, 1382a, 1382b, 1382c; 20 C.F.R. §§ 416.202, 416.202 Sub-

parts K and L. Once SSI benefits are awarded, the SSI recipient must periodically demonstrate continuing eligibility in order to retain them. *See* 42 U.S.C. §§ 1382 *et seq.*

The amount of SSI benefits payable to an SSI claimant [2] is determined by SSA based on the claimant's income, resources,[3] and other relevant characteristics.[4] *See* 42 U.S.C. § 1382(c)(1). SSI payments are made up of a federal benefit, plus an optional state supplement available in many states, less the amount of non-excluded or "countable" income a claimant receives. *See* 42 U.S.C. §§ 1382(b)(1), 1382a(a), 1382e(a). A claimant's SSI eligibility for a given month is generally based on his or her income, resources, and other characteristics for that month, but the amount of SSI benefits is usually determined based on income in the immediately preceding month. *See* 42 U.S.C. § 1382(c); Tr. at 66, 209.[5] Other characteristics that can affect a claimant's eligibility for, and the amount of, SSI benefits include the claimant's living arrangements, for example, whether a claimant is staying in a hospital or nursing home, is an inmate in a prison or other public institution, is outside the United States, or is living in a homeless shelter. *See* 42 U.S.C. §§ 1382(e), (f).

To qualify for SSI, an individual claimant cannot possess resources in excess of $2,000, and a claimant couple cannot possess resources in excess of $3,000. (Tr. at 18, 24, 202.) SSA is required by statute to exclude from resource calculations the full value of a claimant's homestead, the value of household goods and personal effects up to $2,000, the value of an automobile up to $4,500 (or the full value of the automobile if it is necessary for employment or medi-

---

2. I use the term claimant hereinafter to refer to both SSI applicants and SSI recipients or beneficiaries.

3. A resource is defined as cash, other liquid assets, or any real or personal property that claimants or their spouses own and can convert to cash for their support and maintenance. *See* 42 U.S.C. § 1382(a), (b), (j).

4. The claimant's income, resources, and other relevant characteristics include the income and resources of the claimant's spouse, if the claimant is married.

5. Citations to "Tr." refer to the trial transcript.

cal treatment or if it is modified for operation by a handicapped person), the cash surrender value of life insurance policies if their total face value does not exceed $1,500, the value of burial funds up to $1,500, and the full value of property used for self-support. *See* 42 U.S.C. §§ 1382b(a), (d); 20 C.F.R. § 416.1218(b).

For certain claimants, the resources of other persons are deemed to be available to the claimant whether or not the claimant actually owns or has access to these resources. *See* 42 U.S.C. § 1382c(f). Thus, the resources of a cohabiting spouse are deemed to be available to the claimant spouse, and the non-excluded resources of a cohabiting parent and/or parent's spouse are deemed to be available to a claimant child. *See* 42 U.S.C. § 1382c(f)(1).

In 1997, SSA denied 40,500 SSI applications and suspended 35,500 claimants from continued receipt of SSI benefits on the basis of excess resources. (Ex. 24A at 29, 32.)[6] Given the number of factors that may be considered in determining financial eligibility, the amount and extent of a claimant's countable resources is an eligibility factor that is subject to frequent change, thereby affecting the level of payments on a regular basis. (Tr. at 26, 27; Ex. 24A at 10.)

SSA is, by statute, required to provide "reasonable notice" to claimants of any determination regarding the claimant's eligibility for, or regarding the amount of, the claimant's benefits. 42 U.S.C. § 1383(c)(1)(A). SSI notices must, again by statute, be written in simple and clear language. *See* 42 U.S.C. § 1383(o). Regulations issued by SSA require that SSA give the claimant written notice of any initial determination of eligibility or amount of benefits and the reasons for the determination. 20 C.F.R. § 416.1404. The initial determination must state the "important" facts and the reasons for the SSA's conclusions regarding eligibility for, and amount of, benefits regarding any suspension, reduction or termination thereof. *See* 20 C.F.R. § 416.1402. A claimant who disagrees with the initial determination is entitled to seek reconsideration from the agency. *See* 20 C.F.R. §§ 416.1407, .1408.

The SSA is required by its regulations to notify a claimant in writing of any decision on reconsideration, "stating the specific reasons for the determination." 20 C.F.R. § 416.1422. A claimant who disagrees with the SSA's determination on reconsideration may request a hearing, and such requests must state why the claimant disagrees with the determination. *See* 20 C.F.R. § 416.1433.

SSI claimants are entitled to "reasonable" notice. Claimants seeking AABD or AFDC benefits[7] also receive notices about their eligibility for, and the amount of, their benefits. AABD and former AFDC claimants are entitled, pursuant to regulation, to "adequate" notice of any determination affecting eligibility for, and the amount of, benefits. *Compare* 42 U.S.C. § 1383(c)(1)(A) *and* 20 C.F.R. §§ 416.1404, 416.1422 *with* 45 C.F.R. §§ 205.10(a)(4)(i)(B) and 206.10(a)(4). In addition, AABD or former AFDC claimants are entitled to be notified of their right to full access to case records and relevant policy materials to determine whether to request and prepare for an administrative appeal. *See* 45 C.F.R. §§ 205.10(a)(13)(i) and 205.70(c).

As described in SSA's 1998 Annual Report to Congress, SSI recipients "are among the most vulnerable Americans,

---

**6.** Citations to "Ex." refer to exhibits received in evidence at trial.

**7.** The AFDC program was replaced by the Temporary Assistance to Needy Families ("TANF") program as a result of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (also known as the Welfare Reform Act or "WRA"), Pub.L. 104–193, Title I. *See* 62 Fed.Reg. 62123–62172. Regulations for TANF have not, as of the date of this writing, been adopted, and no modifications have been made to update 45 C.F.R. Part 205 to reflect the replacement of AFDC with TANF. *See* 62 Fed.Reg. 62126.

who have little in the way of income or resources. For them, SSI is truly the program of last resort and is the safety net that protects them from complete impoverishment." (Ex. 24A at 4.)

In 1997, 6.5 million claimants received SSI benefits through SSA. (Tr. at 8, 443.) Of that number, 4.4 million claimants qualified on the basis of blindness or disability and 2.05 million claimants qualified on the basis of advanced age. (Tr. at 8.) The average monthly SSI payment to blind claimants was $381.65. The average monthly SSI payment to disabled claimants was $372.52, and for aged claimants, $286.46. (Ex. 24A at 7.) Fifty-nine per cent of the under 65 population receiving SSI (who are, accordingly, not in the aged category) are mentally disabled. (Ex. 24A.)

### Financial Eligibility

SSA determines the amount of monthly income in order to assess an applicant's eligibility for SSI benefits and to compute the amount of an eligible claimant's monthly SSI payment. See 42 U.S.C. § 1382(a). SSA defines income as anything a claimant receives in cash or in-kind that can be used to meet the claimant's needs for food, clothing, and shelter. See 20 C.F.R. § 416.1102.

As countable income increases, a claimant's SSI payment amount decreases. (Ex. 24A at 9.) A claimant becomes ineligible for SSI benefits if his or her countable monthly income exceeds a monthly SSI benefit rate, which varies from state to state. (Tr. at 24, 29–30.) SSA makes the determination of what portion of a claimant's income is countable for SSI purposes and what portion of a claimant's income is excluded. The amount and extent of a claimant's countable income is, accordingly, a major factor in determining SSI eligibility and benefit amounts. (Tr. at 26–27).

SSA classifies income as earned income, unearned income, deemed income or in-kind income. Earned income includes claimant's gross wages and income from self-employment. SSA is required by statute to exclude the first $65 per month plus one-half of the remainder of the earned income in determining countable income. See 42 U.S.C. § 1382a(b).

Unearned income is defined as all income of a claimant that is not earned income. See 42 U.S.C. § 1382a(a)(2). Unearned income includes annuities, pensions, social security payments, alimony, dividends, interest, and rental payments. See 42 U.S.C. § 1382a(a).

Deemed income is the income of other persons, such as that of a spouse or parent, which is deemed to be available to the SSI claimant. See 42 U.S.C. § 1382c(f). Deemed income is subject to most of the income exclusions available to the claimant, plus certain other exclusions. See 20 C.F.R. § 416.1112. Deemed income is also to be reduced by a living allowance that is provided for minor children. See 20 C.F.R. § 416.1163(d). The intended result of the calculation of deemed income from a spouse is to arrive at the same amount of income available to both spouses as would be available if both spouses were eligible for SSI. (Ex. 24A at 10.)

In-kind income includes any food, clothing, or shelter that a third party provides to the claimant. In-kind income is determined by the "current market value" of goods or services that the claimant receives. 20 C.F.R. § 416.1123. The current market value of such goods and services is defined as "the price of an item on the open market in [the claimant's] locality." 20 C.F.R. § 416.1101.

SSA selects one of three methods to compute the value of in-kind income depending on the claimant's living arrangements. If a claimant receives food and shelter while residing in the household of another person for a full calendar month, SSA will presume that the value of the in-kind income is equal to one-third of the applicable federal benefit rate and reduce the claimant's actual SSI payment by that amount. See 42 U.S.C. § 1382a(2)(A).

Once SSA opts to apply the one-third reduction method for in-kind valuation, the actual dollar amount of the reduction is irrebuttable even if the claimant can demonstrate that the value of the in-kind income received is in fact less than one-third of the federal benefit rate. However, if the claimant lives in the household of another person, SSA cannot apply the one-third reduction method if that other person is the claimant's spouse or minor child, or if the claimant establishes that the claimant has an ownership interest in the abode, is liable for payment of any portion of the rent to the landlord, cohabits with persons in receipt of public assistance, or pays a *pro rata* share of the household's monthly operating expenses. *See* 20 C.F.R. § 416.1132(a)-(b); Tr. at 110.

SSA applies the presumed maximum value method of in-kind valuation to claimants who live in their own household but receive food or clothing or shelter from a third party within or outside their household for less than fair market value. Under the presumed maximum value method, the value of any countable in-kind food, shelter, or clothing received by the claimant is presumed to be equal to one-third of the applicable federal benefit rate plus the amount of the $20 general income exclusion. *See* 20 C.F.R. § 416.1140(a).

The third method of in-kind valuation automatically excludes the entire value of in-kind support and maintenance to claimants who reside in one of five specific living arrangements: those residing in (1) a non-profit retirement home, (2) a public assistance household, (3) a temporary shelter due to a disaster, (4) a foster care/family care setting, or (5) a non-medical for-profit retirement institution. *See* 42 U.S.C. § 1382a(a)(2)(A).

### SSA Determination of Financial Eligibility

In 1997, SSA evaluated 1.5 million applications for SSI benefits. (Ex. 24A at 15.)

To apply for SSI benefits, a claimant or his or her authorized representative must file a signed application with SSA. To complete the application form, the applicant must answer approximately 100 questions which inquire about eligibility factors that may affect the applicant's eligibility for, or the amount of, the ultimate SSI benefit received by the claimant. (Tr. at 222.)

Commencing in 1992, SSA employees began meeting with SSI applicants in face-to-face interviews in SSA field offices, obtaining eligibility information from them, completing the SSI application on behalf of the applicants, and entering this information contemporaneously into a computer database called Modernized SSI Claims System ("MSSICS").[8] (Tr. at 43–44, 343.) At the conclusion of the in-person interview, the claims representative prints a computer-generated SSI benefits application, and the claimant signs it. However, the applicant is not given a tabulation of the financial data that the claims representative enters into the computer.

After the claims representative enters all eligibility information into the computer, including any information provided by third parties, a software person makes the eligibility determination and issues a notice of financial eligibility or a notice of denial. (Tr. at 47.) Periodically, between anywhere from one to six years, claims representatives must redetermine the financial eligibility of each claimant who was awarded benefits. In redetermining financial eligibility, a claims representative will, for example, calculate such items as net rental income by determining gross rental income and subtracting applicable expenses. The claims representative enters the mathematical results into the computer, but not the underlying calculations. No record is kept of the underlying calculations, and the SSA does not provide a written tabulation or other breakdown of

---

8. If claimants cannot travel to SSA field offices, claims representatives interview the claimants by telephone and mail the complet-ed applications to claimants for their review and signature. (Tr. at 24.)

the information fed into the computer for the claimant's review.

### SSA Data Storage

SSA maintains approximately 1,338 field offices throughout the United States. The field offices maintain hard copies of claimant information in case files that are held at the field office for one year before being sent to a central depository. After a certain period of time the central depository sends claimant case files to a more remote "records center" where the case files are eventually destroyed. (Tr. at 47.) Due to difficulty in case file retrieval, when a claimant arrives in a field office, the file is usually not retrieved. Instead, a new file is opened. (Tr. at 47.) When a request for a file is made by a claimant, the field office may require one or more weeks to locate case files that are still in existence. (Tr. at 48.) On occasion, a field office may not be able to locate a claimant's case file at all. (Tr. at 48.) Information as to how SSA selected the specific date for the commencement of his SSI benefits or how SSA assigned a specific living arrangement classification may well be available only in the case file.

SSA also stores and maintains data concerning claimants' benefits on its mainframe computer. The SSA computer system includes, as here relevant, three principal storage subsystems: the supplemental security master record ("SSR"), MSSICS, and the Notice Retrieval system.

SSA created the SSR in 1974 in order to store basic information about all claimants nationwide. The SSR permits access for the storage of new data concerning claimants and for the retrieval of data (1) by a computer program that performs calculations to determine SSI payment amounts and (2) by another computer program that generates financial eligibility and benefits notices. (Tr. at 357, 359–60.) Each weeknight, SSA updates the SSR with revised claimant information received during the immediately preceding business hours. If the information results in a recalculation of benefits or change of eligibility status by the software which analyzes the impact of the new data, the automated notice program produces an automated notice which includes some but not all of the information generated by the program performing the re-analysis. (Tr. at 352.) This is because SR captures and stores the bottom line produced by the analytical software program but not the interim calculations and determinations leading to the final calculation. In addition, SSR stores financial eligibility information in an abbreviated summary form but does not store the details. For example, SSR cannot identify the specific resources said to be owned by the claimant and cannot specify the form or source of in-kind income attributed to a claimant. Nor can SSR provide any information on state and federal living arrangement classification. Nor can SSR provide information as to how the SSA arrived at the federal benefit rate. (Tr. at 58–59, 89.) Further, the SSR records the disability onset date and date of first payment but does not explain how the SSA arrived at those dates.

The SSR is scheduled to reach the limits of its storage capacity within the next three years, and if SSR reaches its physical storage capacity, SSA will not be able to process and issue SSI checks. (Tr. at 353–54, 366.)

SSA created MSSICS in May 1992 in order to store financial eligibility information obtained from SSI applicants subsequent to MSSICS' becoming operational during the application interviews. (Tr. at 43, 336–37.) In addition MSSICS is designed as an on-line computer system which is available to claims representatives during interviews with claimants so that the interviewer may view data on file and data added to the file. Further, MSSICS stores data obtained from claimants during interviews which are used to evaluate initial and ongoing SSI eligibility. While MSSICS does not itself perform any of the computations necessary to assess eligibility

or determine benefits, it employs a separate software program to perform such calculations and feeds the results back to MSSICS so that the claims representative can view the results of new information added to MSSICS by the representative. (Tr. at 44.)

While MSSICS is intended to replace the early data storage system before it reaches capacity, it is not intended that all information in the old system will be transferred to the new. SSA permits but does not require claims representatives to enter pre-MSSICS claimant information into MSSICS. As a result, at present, only 20% of the 6.4 million SSI recipients nationwide have their financial eligibility information stored on MSSICS. It is anticipated that the percentage of SSI claimants with data on MSSICS will grow in an accelerating fashion from 20% to 100% over the next 50 years. (Tr. at 346.)

Operating alongside these software programs is the Notice Retrieval system, which stores and retrieves all notices sent to claimants from the date the system became operational in 1997. SSA's claims representatives can view a computer image of the notices in response to claimant inquiries. (Tr. at 483–84.)

*Content of SSA Notices*

Whenever SSA makes a decision on a claimant's initial or continuing eligibility for SSI benefits based on claimant's income, resources, or living arrangements, it must mail a financial eligibility and benefits notice to the claimant. (Tr. at 14, 18–25.) SSA mails approximately 20 million such notices to SSI claimants each year, for an average of 3 notices per claimant per year. SSA generates 95% of all financial eligibility benefit notices by computer and the rest, manually. At present, SSA employs 53 persons to maintain the ongoing operation of SSA's computer systems for SSI claimants. (Tr. at 491.) The same persons are also employed to modify the SSI computer system as needed to conform it to changes in SSA policy or changes imposed by Congress or the courts. (Tr. at 440–41.) On average, these persons devote as much as 80% of their work time keeping the computer system running. (Tr. at 467–68, 493.)

Because the calculations programs only generate limited financial information and calculations for storage in the SSA database, the automated notices system cannot retrieve and the notices themselves do not contain all of the financial information and financial calculations necessary to explain and understand increases, reductions, suspensions, or terminations of SSI benefits. (Tr. at 414.) For example, while an automated notice may state that a benefit has been reduced because of a change in resources owned or deemed available to a claimant, the notice will not identify the categories of resources or values attributed to them. (Tr. at 60.) The notices do not, for another example, specify a claimant's federal and state living arrangement classification, while stating that benefits have been decreased or cut off because of a change in the claimant's living arrangements. (Tr. at 57.) Nor will the notices specify the claimant's federal or state benefit rate or explain a change in a claimant's income, except by reference to a change in one or more of the broad categories of income. (Tr. at 27, 369.) The notices do not explain a change in the computation of deemed or in-kind income, except to set forth the total amount that has been assigned to those income categories. (Tr. at 33.) Nor do the notices include the calculations that are used to determine the numerical outcomes contained in the notice. (Tr. at 53–54.) Beyond this, the notices do not refer to the law or regulation that forms the basis for the determination. (*Id.*) Nor do the automated notices explain why SSA has chosen a specific date for commencement, change, or termination of SSI payments to a claimant. Nor do notices cite the statutory or regulatory authority for the determinations made concerning eligibility or benefits. Finally, although it is possible to

generate automated notices containing such information, despite the software limitations already referred to, the notices do not and have not informed claimants of their right to obtain access to their case files. (Tr. at 56.)

When a claimant receives a notice, the text of the notice informs the claimant that he or she can call a toll free telephone number or visit a designated office to obtain answers to any questions or to obtain any further information. When a claimant places a call, SSA routes the call to one of 37 teleservice center sites throughout the country. The calls are received by teleservice representatives who have a general knowledge of social security benefits and SSI benefits and access to SSR and MSSICS but who do not have access to information located on hard copy files in SSA field offices. (Tr. at 40.) Because the representatives suffer the same lack of access as the Notice Retrieval system, they cannot answer questions such as how SSA determined the amount of deemed income or net rental income or the starting or termination date of SSI payments or what specific living arrangements classifications or legal authority justified the changes outlined in a claimant's notice.

In 1997, claimants placed 75.3 million calls to the toll-free number. Of those 19.8 million calls, 26.3%, were met with a busy signal or were terminated by SSA or the caller before conducting a conversation with a representative. (Ex. 24A at 82.) In 1996, claimants placed 94.2 million calls to the toll-free number. Of those, 46.2 million calls, 49%, were met with a busy signal or terminated before a conversation with a representative. In 1995, claimants placed 121.4 million calls to the toll-free number. Of those, 64.7%, 78.6 million calls, were met with a busy signal or terminated before a conversation. In 1994, 62.6 million calls, 57.5%, out of 109 million calls were terminated without contact or met with a busy signal.

Alternatively, claimants requiring assistance may bring the notices to the field office for explanation. Between January 18, and February 11, 1994, the SSA's Office of Inspector General ("OIG") estimated that 8,100 people visited field offices each day. Field office representatives suffer the same limitations concerning access to data on SSA's computer system as telephone representatives and may or may not have available in addition the claimant's hard copy case file.

*Investigation into Notices by OIG*

In September 1992 OIG issued a report entitled "Clarity of Supplemental Security Income Notices," which found that SSA had no systematic process for monitoring the effectiveness of its notices. The OIG report made the following recommendation: "We suggest that SSA include a worksheet with all award and postentitlement notices. This worksheet should itemize the gross payment, all deductions, the net payment amount, and the payment date." (Ex. 16 at 11.) Further "the SSA should revise the SSI computer system to allow the issuance of notices which accurately reflect future payments based upon known or estimated earned and unearned income." (Ex. 16 at 12.)

In a companion report entitled "Examples of Revised Supplemental Security Income Notices" also issued in September 1992 the OIG examined automated notices. OIG suggested a revision of the notice of award to include a separate worksheet: "information about the amount of the payment and deductions from that payment [should be] detailed in a work sheet for easy reference." (Ex. 17 at 5.) The OIG specifically commented on the difficulties presented by inadequate payment information: "Several respondents commented that they could not understand how their payments were figured. Typical of these comments, 'I need further information about how the computer calculates the dollar amounts to be received. If a disabled child stays with a parent, how does this impact on the amount he is to get?'" (Ex. 17 at 17.) OIG's suggested revision on

this notice also included a separate work sheet: "Information about the amount of the payment and deductions from that payment are detailed in a work sheet for easy reference." (Ex. 17 at 17.) OIG's suggested revision of the Notice of Planned Action added detailed information on payment calculations in the body of the notice. (Ex. 17 at 36.)

In response to the OIG's recommendations, Gwendolyn S. King, then Commissioner of Social Security, had the following written comments:

> We appreciate the suggested possible solutions and the proposed revisions presented by OIG. We will take the suggestions into consideration along with the results of surveys, focus group testing, and information from other sources, when we revise the notices. We will determine whether certain of the suggestions are technically feasible. We will also determine whether the suggested formats meet our policy and legal requirements.

(Ex. 17 at A–4.)

Although Commissioner King undertook to consider the OIG's suggestions with surveys and focus groups testings, in fact SSA never assessed claimant reaction to the addition of a one page worksheet. (Tr. at 309, 311.) Nor did the Commissioner consider OIG's budget worksheet recommendation with Charles Wood, Associate Commissioner of the Office of Systems Design and Development, or George Schmittle, SSA's computer specialist in charge of SSI notices, or Lorna Leigh, SSA's computer specialist in charge of SSI computations software, in order to permit these specialists to do a feasibility assessment. Ultimately, although SSA discussed whether adding a one-page worksheet to its notices would be advantageous to claimants, "it was found to be too costly and too burdensome" to SSA. (Tr. at 250–51.)

To date SSA has not implemented the 1992 OIG recommendations to include detailed information about the amount of payment and any deductions from that payment on a separate work sheet, and the agency has no plan to do so in its current five-year plan. (Tr. at 498–99.)

In 1994, the United States General Accounting Office ("GAO") also investigated the effectiveness of SSI notices. In testimony before the Subcommittee on Social Security of the Ways and Means Committee of the United States House of Representatives, the director of the GAO testified that "GAO selected and read over 500 letters to get a sense of how easy or difficult they were to understand. GAO staff with an accounting background and years of Social Security program knowledge had difficulty determining or verifying specific points contained in the letter." The GAO found that "(1) The purpose of [the] letter [is] not being clearly stated; (2) No information [is supplied] on dollar amounts used by SSA to adjust payments; (3) Apparent conflicts [exist] in information [in the notices]; and (4) [There is a] ... need to perform complex analyses to reconstruct adjustments to benefits." (Ex. 29 at 1035.)

While SSA considered discussed GAO's conclusions, it took no action to redress the problems identified by GAO. (Tr. at 317–19.) Instead, faced with Year 2000 problems and to new SSI-related legislation pertaining to welfare reform, alcoholism, and drug addiction that required the development of new notices to comply with the legislation, SSA made a policy decision to suspend improvements to SSI notices while the agency devoted its limited computer systems resources to these novel problems. (Tr. at 286, 293.)

*Feasibility of SSA's Computers Providing Proposed Notice Changes*

Testimony at trial showed that it is technically feasible to generate by computer program a short summary of the calculations resulting in an award, change, or termination of benefits along with a fact sheet that defines with greater specificity

than at present the changes in the federal and state specific living arrangement classifications which affect eligibility and benefit amounts. (Tr. at 53, 433, 436, 487, 505–06, 508–09.) The generation and retrieval of this information can be achieved as part of the same automated process that currently creates the notice itself. (Tr. at 505–06, 508–09.) Computer specialists for SSA and for plaintiffs agree that the most efficient way to produce budget worksheets is in the computerized "job stream" that creates the automated notices themselves. (Tr. at 436, 486–87, 518–521.) Computer programmers for SSA and plaintiffs also agree that a team of three or four programmers would require approximately six months to design, develop, and debug a computer program able to create budget worksheets and include them in notices to claimants. (Tr. at 3, 29, 95, 103, 521.) If SSA were directed to include a budget worksheet with notices and to modify the content of the notices to include the other information that plaintiffs seek, Charles Wood, SSA's Associate Commissioner of the Office of Systems Design and Development, testified that SSA personnel at current staffing levels would require two years to accomplish it. (Tr. at 103–04.) However, the SSA. personnel who would be assigned to work on implementing the computer-generated budget worksheet and plaintiffs' other proposals are the same as are presently working on the agency's five-year plan. (Tr. at 494.)

Computer specialists at trial compared the proposed changes to SSA's computer system with a computerized notice system already operating in New York State. New York participates in several federally funded programs including the, Temporary Assistance for Needy Families,[9] Medicaid, and food stamp. In April 1972, the New York State Department of Social Services ("NYSDSS") promulgated a state regulation that required its notices to include, *inter alia,* "detailed reasons for the pro-

posed action." 18 N.Y.C.R.R. § 358.8(a)(2). On December 23, 1988, NYSDSS further expanded its notice requirements to include "the specific reasons for the action, the specific laws and/or regulations upon which the action is based, the right of the applicant or recipient to review the applicant's or recipient's case record and to obtain copies of documents which the agency will present into evidence at the hearing, and a copy of the budget or the basis for the computation, in instances where the social services agency's determination is based upon a budget computation." 18 N.Y.C.R.R. § 358–2.2(a)(2), (3), (9), and (14). Since 1993, NYSDSS has utilized a computerized Client Notices system to generate notices automatically by resort to data stored on NYSDSS's mainframe computer. (Tr. 115.) The automated notices not only advise claimants of each determination affecting their eligibility or benefits but cite the specific law or regulation that supports the determination; inform the recipient of their right to review and to obtain free copies of the case record; inform the recipient of the income and resource dollar limits and other budgetary factors that will trigger a reduction or termination of program benefits; and, finally, include calculations that support the determinations made. (Tr. 53, 54, 57, 78–79, 116–17, 120.)

### Availability of Counsel

The adequacy of notice obviously turns in part on the audience to which it is addressed. SSA presently recognizes that some of the problems presented by the agency's notices might be alleviated if claimants were represented by legal counsel. Thus, its automated notices invite claimants who want help with an appeal of an SSA decision to contact "groups that can help you find a lawyer or give you free legal services if you qualify." (Ex. 1A at 6.) The largest nationwide organization

---

**9.** See Title IV–A of the Social Security Act, as amended by the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") of 1996. 42 U.S.C. §§ 601 *et seq.*

providing free legal advice at present is the federally funded Legal Services Corporation ("LSC"). However, the availability of such assistance in dealing with the problems raised by SSA's notices is extremely limited.

At trial, Alexander Forger, past president of LSC, testified that in 1994 Congress reduced LSC funding from $415 million to $287 million and that LSC has not recovered since. (Tr. at 524–25.) As a result, one-third of all LSC-funded lawyers were laid off, and the priorities of those remaining were shifted from representation in SSI benefit cases towards representation in matters involving domestic violence, child support, and eviction prevention. (Tr. at 523, 525–26, 539.) Retained counsel are unlikely to represent SSI claimants because SSA cannot deduct any portion of a retroactive award to compensate private attorneys.[10] In the absence of assistance from LSC and the paid professionals of the legal profession, claimants are left either to their own devices or to the sporadic assistance of individual practitioners willing to assist claimants on a pro bono basis. Nor is this resource adequate. As two recent commentators have noted:

> Although quantifying the extent of the crisis is difficult, there is almost universal acceptance that the poor have been denied needed legal services. One survey by the ABA, for example, has concluded that no more than twenty percent of poor people's legal needs are being addressed. Given that most people living in poverty encounter legal difficulties on a regular basis, it is not surprising that, on a national scale, the aggregate unmet legal needs of poor Americans are staggering. Extrapolating existing data, a leading commentator has concluded that, "very conservatively, the amount of unmet legal needs of the poor nationwide is twenty million

hours per year. The legal problems for which the poor can find no representation fall into various categories; for example, in New York State, the most frequent reported legal troubles include housing issues, public benefits problems, health care concerns, consumer and utility problems, discrimination and employment matters, and family issues. Given current poverty trends, the legal needs of the poor can only be expected to escalate."

Eldred and Schoenherr, The Lawyer's Duty of Public Service, 96 W. Va. L.Rev. 367, 372–73 (1994).

### Procedural History

Plaintiff initiated this action on June 8, 1994. Plaintiff filed an amended complaint on June 26, 1995. By memorandum and order dated January 12, 1996, the Court denied in part defendant's motion to dismiss, holding that the Court had jurisdiction to consider plaintiff's allegations of violations of due process and equal protection. On December 31, 1997, the Court granted plaintiff-intervenors' motion for intervention.[11] The Court subsequently certified a class consisting of all SSI applicants and recipients who, since April 9, 1994, have not received written notice from SSA that includes: (a) an explanation of how the SSI application date and period of retroactive eligibility were determined; and/or (b) identification of the specific types and values of resources which render them ineligible for SSI payments; and/or (c) a description of the SSI benefit rate, including an explanation of the living arrangement classification; and/or (d) SSI budget computations, showing the SSI payment rate, the amounts and types of gross income and/or resources, the deductions and disregards from gross income and/or resources, and the income and benefit months; and/or (e) citation to specific

---

**10.** In contrast, SSA is authorized to pay up to 25% of a claimant's award directly to private counsel in Title II Social Security Disability program, a program distinct from SSI.

**11.** Plaintiff Ford and the intervenors are herein referred to throughout as "plaintiffs."

laws and/or regulations upon which the SSI determination is based; and/or regulations upon which the SSI determination is based; and/or (f) the right to review and obtain free copies of SSA records on the SSI claimant, as well as specific policy materials, including legal authorities, used to support the SSI determination.

*See Ford v. Apfel,* No. CV–94–2736, slip op. at 15–16 (E.D.N.Y. Sept. 14, 1998). The Court conducted a bench trial on the issues raised by the amended complaint on December 23, 1998, January 4, 5, and 6 and February 5, 1999.

## DISCUSSION

Plaintiffs claim that defendant has violated their due process and equal protection rights. This Court has jurisdiction over these claims pursuant to 42 U.S.C. § 405(g). *See Ford v. Shalala,* 1996 WL 19161, CV–94–2736, slip op. (E.D.N.Y. Jan. 12, 1996).

▮ Plaintiffs assert that substantive deficiencies in the content of defendant's notices deprive claimants of property without due process of law. The Fifth Amendment to the United States Constitution prevents federal action that causes a deprivation of a protected property interest without due process. *See Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Since 1970, the Supreme Court has recognized that, in appropriate circumstances, a person's interest in federal entitlements may constitute a protected property interest. These entitlements included public assistance benefits, *Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), food stamp benefits, *Atkins v. Parker,* 472 U.S. 115, 128, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985), and social security disability benefits. *See Mathews,* 424 U.S. at 332, 96 S.Ct. 893. There is now generally recognized "a significant property interest in the fair adjudication of a claimant's eligibility to receive disability benefits." *Rooney v. Shalala,* 879 F.Supp. 252, 255 (E.D.N.Y. 1995).

In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court discussed two factors that must be present for a government benefit program to create a constitutionally protected property interest. First, the benefit claimant must have a legitimate entitlement to the benefit rooted in state or federal law. In addition, the claimant must "presently enjoy" that entitlement as opposed to expecting to receive it at some undefined time in the future. *Id.* at 577, 92 S.Ct. 2701.

▮ In this case, the purpose of SSI was to provide subsistence level income to persons who are blind, disabled, or have attained the age of 65. By statutory design, SSI benefits "shall be paid" to "each aged, blind or disabled individual ... whose income ... and whose resources" do not exceed designated statutory thresholds. 42 U.S.C. §§ 1382(a)(1) and 1383(a)(1). Because it is undisputed that plaintiffs meet the categorical and financial eligibility criteria, they "presently enjoy" a "legitimate claim of entitlement" to their SSI benefits that is firmly "rooted in federal law." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. Where federal laws and regulations mandate the delivery of a particular entitlement to those eligible to receive them, the protected property interest is extended to entitlement applicants as well as entitlement recipients. *See Atkins v. Parker,* 472 U.S. at 128, 105 S.Ct. 2520. In addition, SSA's own regulations provided that defendant cannot deny, reduce, suspend or terminate SSI benefits unless the agency issues a notice that alerts the claimant to the right of appeal. *See* 20 C.F.R. § 416.1336(a) and (b). Defendant's regulations "may have justified plaintiffs' legitimate claim of entitlement." *Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

▮ Once a constitutionally protected property interest exists, procedures utilized to reduce or terminate the protected property interest must comport with the

constitutional requirement of due process. Due process requires "a meaningful opportunity to be heard." *Goldberg v. Kelly*, 397 U.S. at 267, 90 S.Ct. 1011; *accord La-Chance v. Erickson*, 522 U.S. 262, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998). Such an opportunity is assured by means of "a notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

■ In *Mathews v. Eldridge*, the United States Supreme Court considered three factors in assessing the constitutional sufficiency of governmental procedures as follows:

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. 893. Application of the three factors follows.

### Private Interest

■ The first factor to be considered in assessing the constitutional validity of the procedures used to determine a citizen of a protected property interest is the nature of the potential deprivation created by that decision. *See Eldridge*, 424 U.S. at 341, 96 S.Ct. 893.

The nature of the deprivations here at issue quite obviously equal, if not exceed, the kind of "grievous loss" which the Su-

preme Court has in the past found to outweigh the governmental interest in summary adjudication. *See Goldberg*, 397 U.S. at 262, 90 S.Ct. 1011. In *Goldberg*, the Court applied due process principles to the case of welfare recipients who faced "brutal need" if their welfare benefits were summarily discontinued without notice. It held that such recipients must be provided "timely and adequate notice detailing the reasons for a proposed termination." *Id.* at 267, 90 S.Ct. 1011. As the *Goldberg* Court noted:

> For qualified recipients, welfare provides the means to obtain essential food, clothing, housing and medical care. Thus, the crucial factor in this context … is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits.

*Id.* at 264, 90 S.Ct. 1011.

In this case, the degree of deprivation visited upon SSI claimants is at least as severe as that faced by welfare claimants, if not greater. Like public assistance recipients, SSI claimants must meet financial eligibility requirements which place them substantially below the federal poverty line. In 1998, HHS determined that the minimum subsistence level for one-and two-person households was $670 per month and $904 per month, respectively. In the same year, the nationwide SSI federal benefit rate for an individual was $494 per month (73.6% of the federal poverty line) and SSI benefit rate for a couple was $741 per month (82% of the federal poverty line).

However, in addition and unlike many public assistance recipients, SSI claimants also confront the challenges of disabling illness, blindness, or advanced age. As described in the "SSI Annual Statistical Report 1997":

> The SSI program is a very important program that provides nearly 6.5 million aged, blind and disabled individuals with basic necessities of food, clothing and

shelter. [SSI claimants] are among the most vulnerable Americans who have little in the way of income or resources. For them, SSI is truly the program of last resort and is the safety net that protects them from complete impoverishment.

(Ex. 24 at 3.)

The fact that claimants are not only poor but also aged, blind, or disabled places them "in a profoundly inferior position in relationship to a government bureaucracy." *Willis v. Lascaris*, 499 F.Supp. 749, 756 (N.D.N.Y.1980). Nancy Lloyd, an SSI program analyst, testified at trial that SSI claimants "are often intimidated by the very fact that they have gotten a notice from the government." (Tr. at 248.) Eugene Doyle, a social worker who has reviewed over 1,000 notices on behalf of 200 claimants, testified that notices of reduction in or termination of benefits create an immediate sense of "confusion coupled with fear and trepidation" because the claimants "are elderly individuals or ... quite severely disabled." (Tr. at 12.) Those with mental disability experience "tremendous trauma" and have on occasion "expressed thoughts of suicide in response to notices that threaten to terminate benefits." (Tr. at 13.) The notices create "tremendous emotional upheaval" because they jeopardize "the only source of income" for persons "who are extremely frail [and] are surviving at a level of income that is below the poverty level." (Tr. at 22.) In many instances, the intended government action "usually also means hunger, very often homelessness .... [T]hese are earth-shattering calamities." (*Id.*)

John Bowman, an Iowa attorney who represented the plaintiff Reed family and "several thousand" other SSI claimants over the last ten years, testified that recipients are "very distressed" when they receive financial eligibility notices because "they need that money for additional instructions or specialized equipment or just day-to-day living." (Tr. at 106.)

Several plaintiffs testified to the distress caused by the SSI notices. Plaintiff Arleen Kanea received the notice but was reluctant to contact defendant because "I was afraid [that defendant] would start delaying my checks so I wouldn't be able to pay the rent" or "that [defendant] would stop everything." (Tr. at 175.) She testified that receipt of defendant's successive notices "keeps [her] off balance" because she could never reliably predict "what [she] would get next." (Tr. at 176.)

After receiving an SSI notice, plaintiff Julie Umerle contacted defendant to ascertain the meaning of the notice. These follow-up contacts with defendant left her "very upset" and "humiliated" to the point that she asked SSA to "drop [her SSI application]." (Tr. at 143.) As a result, Umerle has had "extreme difficulty" meeting her subsistence needs. (*Id.*)

Because persons determined to be eligible for SSI automatically qualify for federal Medicaid benefits, loss of SSI eligibility also places their future Medicaid coverage in jeopardy. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(II). At trial, Bowman testified that the loss of SSI eligibility, "if it goes on long enough, [will result in] the loss of the [claimant's] Medicaid card." (Tr. at 106.)

In considering the nature of the deprivation at stake, the *Eldridge* Court took into account not only the immediate impact of the loss of benefits, but the likely duration of an improper termination of benefits before it could be corrected. In this connection, the Court considered "the torpidity of the administrative review process." *Eldridge*, 424 U.S. at 342, 96 S.Ct. 893.

In *Eldridge*, the Court found a one-year period to contest and overturn an improper termination of benefits to be sufficient to impose a significant hardship on welfare recipients. In this case, the administrative appeals process is even slower. SSI claimants can preserve their SSI benefits up through the stage of an initial reconsideration by administrative authorities; however, if after reconsideration the claimant

does not prevail, the defendant can reduce benefits. The claimant may seek the restoration of SSI benefits by requesting a hearing before an administrative law judge and, if unfavorable, by review of the hearing decision by defendant's Appeals Council. See 20 C.F.R. § 416.1429. In fiscal year 1998, defendant required an average of 850 days to complete review of a hearing decision. Over the last five years, the average time required by defendant to complete administrative review has climbed from 417 days in 1994 to 505 in 1995, to 668 days in 1996, to 784 days in 1997, and to 850 days in 1998. (Ex. 24A.)

Taking into account both the economic and emotional impact of wrongful termination of SSI and the time during which it is likely to continue, I conclude that there is a substantial private interest in adequate and accurate SSI notices at stake in this litigation.

### Risk of Erroneous Deprivation

The second step in the due process analysis is whether the lack of notice creates a substantial risk of erroneous deprivation of the protected property interest.

In order to enlist the effective support of the party most interested in correcting errors, a notice must "detail the reasons for the proposed termination" so the recipient is able to determine whether the intended action "rests on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of the particular case." *Goldberg*, 397 U.S. at 267–68, 90 S.Ct. 1011.

Plaintiffs contend that the omissions in the SSI notices concerning which they complain prevent claimants from checking the factual accuracy and legal justification for proposed actions by SSA that affect

their benefits or from making an informed decision whether to appeal SSA's benefits determination. Each of the claimed deficiencies in SSI notices is addressed below.

### Notices Do Not Provide Individualized Calculations

██ When the calculations are critical to the determination of eligibility or benefit amount, written notice must explain the formula by which the benefit amount was calculated, *see Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir.1980), identify the underlying facts upon which the calculations were based, *see Banks v. Trainor*, 525 F.2d 837, 839 (7th Cir.1975), and include a breakdown of the sums attributable to each factor in the equation. *See id.* at 842. Without this information, claimants cannot check the factual much less the mathematical accuracy of defendant's intended action.[12]

Because of the limited information stored in defendant's supplemental security record database described above, the agency's notices at present lack much of the information necessary to assess the correctness of the financial calculations that support the intended action. (Tr. at 414.)

For example, defendant's notices of a change or termination of the benefits because of a change in claimant's "rent, interest, dividends or royalties" income will not identify in which of those categories the agency believes a change has occurred. (Tr. at 369.) A determination, including an initial determination, concerning the amount of a claimant's deemed income or in-kind income will simply state the total dollar amount assigned to each of those income categories with minimal information concerning the findings made by the

---

**12.** Plaintiff Desiree Reed received an automated notice that stated that she would receive a reduction in her SSI benefits but included no calculation explaining how SSA had arrived at this determination. Upon review of the notice, Bernard Wasiljov, an SSA computer specialist, identified a mathematical error. (Tr. at 410–12; Ex. 13A.) Mr. Wasiljov then testified that a worksheet on calculations attached to the notice would permit the SSI claimant to know how much income could be earned in any one month without risk of loss of SSI benefits to the individual. (Tr. at 420.)

agency to justify the determination. (Tr. at 33.)

Thus, Eugene Doyle testified that notices about in-kind income "simply say that you have $183, for example, in in-kind support and maintenance because you received food, clothing or shelter from someone else. It doesn't identify who the someone is. It doesn't identify how the value is arrived at. It doesn't make a distinction between the different types of calculation of in-kind income." (*Id.*)

Notices that adjust SSI payments due to deemed income similarly lack basic information necessary to assess the accuracy of the determination. For example, notices do not state whose income has been deemed to be the income of the person on whose behalf the benefit is awarded or the formula by which the determination has been made that a parent's income will be deemed to be a child's. Plaintiff John Reed's children periodically lose and regain their SSI eligibility based on changes in the family income which the family finds difficult to understand, much less predict. The notices do not state "what income was allocated to other family members, if any, and ... how much income was deemed .... Looking at the notice, one can't tell how much the child is ineligible by .... There is no way for a parent to plan or to see the direct impact of earnings on a child's benefits." (Tr. at 67–68.)

The risk of error in this area by wrongfully attributing either earned or unearned income to a claimant is significant. In 1997, 2.8 million claimants received earned income or unearned income in the form of social security benefits, veterans benefits, public assistance benefits, worker's compensation, pension benefits, income from parents or spouses and in-kind "support and maintenance" from other third parties.

A third deficiency concerns the failure of defendant's notices to inform claimants which of their resources are considered to have exceeded statutory thresholds, the value attributed to the resource, or its owner, where the owner is someone other than the claimant. Whereas the receipt of earned and deemed income may simply reduce claimant's SSI payments, "resource eligibility is a bright line. If your countable resources are above $2,000 for an individual [or] $3,000 for a couple, then you don't get anything." (Tr. at 24.)

Other avenues available to the claimant to discover SSA's determination of a claimant's resources are also inadequate. In order to obtain the information by telephone, assuming the claimant can access a claims representative by these means, SSA must have a MSSICS computer file on the claimant that the SSA representative can access. As noted above, of 6.4 million SSI claimants nationwide, only 1.28 million (20%) have financial eligibility information stored on MSSICS. (Tr. 337, 346, 455.)

The only other method to obtain resource-specific information is through a review of the claimant's case file at an SSA field office, if it can be found. As discussed below, the notice does not, at present, notify claimants of the availability to them of these records. Moreover, the field office typically stores case files for only one year and thereafter ships them to a central depository, where they are eventually destroyed. (Tr. at 47.) As a result, a devastating determination of ineligibility may be leveled on the basis of a change no more specific than "you have countable resources in excess of $2,000."

In addition, SSI notices routinely omit basic information concerning what SSA takes to be a claimant's benefit rate and living arrangement classifications. Before defendant engages in any SSI eligibility calculations, it assigns the claimant an SSI benefit rate. This dollar amount is the mathematical starting point from which earned and deemed income is subtracted in order to compute a claimant's eligibility and actual monthly SSI payment amount. (Tr. at 25.)

The SSI benefit rate consists of a federal benefit rate and an optional state supplement. The amount of each component

depends on the claimant's federal and state living arrangement classification as defined by defendant's regulations.[13]

In 1998, for example, the federal benefit rate for claimants who live in their own household was "$494 for an individual [and] $741 for a couple." (Tr. at 25.) If the claimant was a New Yorker, living alone, defendant added an $86 "optional state supplement" to arrive at the claimant's "SSI benefit rate" of $580 per month. (Tr. at 27.)

Without knowing the federal benefit rate, the optional state supplement, and the federal and state living arrangement classifications on the basis of which SSA has arrived at its determinations, claimants do not know if the SSA has correctly calculated the SSI payments to which they are entitled.

Defendant's notices also fail to identify the provision of federal law, federal regulation, or "POMS" citation[14] that has been applied to make determinations to grant or deny, change, or terminate benefits. Without reference to such authorities (and most often without other legal assistance), plaintiffs are deprived of any meaningful way of correcting legal error by consulting such legal texts as may be available in public libraries, regional SSA offices, or elsewhere.

The *Goldberg* Court noted that due process principles require a claimant to be given "an effective opportunity to defend [the proposed termination] by presenting [his/her] own arguments and evidence." *Goldberg*, 397 U.S. at 267, 90 S.Ct. 1011. Members of the plaintiff class are "elderly and generally poor" and "rely on the Government to properly fix their ... benefits." *Ellender v. Schweiker*, 575 F.Supp. 590,

604 (S.D.N.Y.1983). Given the difficulty in securing legal representation, they "cannot be expected to seek professional services to review checks and statements [that are] received each month." *Id.* Because they are so dependent on "the notices they receive from the Government," the omission of reference to legal authority means that claimants "have no way of being apprised of their legal rights—in fact, would . not even know that their legal rights were implicated." *Id.*

Related to the above, however, is the failure of SSI notices to inform claimants of their right to copies of agency policy materials as well as case files.

Defendant's do not inform the claimant "of the right to review a case record ... or to get free copies of relevant materials from the case record ... to review Social Security policy materials and to review free copies of those materials." (Tr. at 56.) The failure to provide plaintiff's with notice of how to obtain copies of policy materials means that they cannot "mold their arguments to respond to the precise issues which the decision maker regards as crucial." *Eldridge*, 424 U.S. at 346, 96 S.Ct. 893.

In *Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir.1970), the Second Circuit, citing *Goldberg*, ruled that the procedures for terminating public housing tenancies violated due process because "access to the material in the [tenant's] folders" was denied "when the entire folder is considered by the [agency] in its determination of eligibility." The Court noted that a tenant's appellate rights were "of little value" if the agency's determination "can rest on items in the tenant's folder of which he has no knowledge and

---

**13.** Living arrangement classifications for purposes of SSI are not something that can be arrived at intuitively. One can be classified as living alone even if one is living in the same apartment or house with other people if, for example, one has arrangements pursuant to which one pays a designated amount of money for room and board or if the claimant pays a designated amount in rent and pre-

pares food separately from others in the house. (Tr. at 27–28.)

**14.** The Program Operations Manual System ("POMS") is a multivolume set of step-by-step instructions used by defendant's field office staff. (Tr. 56–57.)

hence has had no opportunity to challenge." *Escalera*, 425 F.2d at 862.

The magnitude of the risk of error because of these omissions is revealed by consideration of the effect they inevitably have on the proper functioning of those processes designed by the agency for the very purpose of correcting error. Absent basic information with respect to the factual and legal premises for agency action, claimants cannot evaluate whether an appeal is warranted much less make that determination in the short time given them to preserve their appeal rights.

Defendant requires claimants to request reconsideration of an intended action within ten days of receipt of the notice in order to preserve their SSI benefits pending the outcome of the reconsideration. According to the trial testimony, claimants' only logical recourse would appear to be to request reconsideration in all instances because claimants "are living on the edge of poverty and they need this money to support their children." (Tr. at 101.)

However, the benefits of such a strategy, like any strategy grounded on ignorance, may well prove illusory. Although the advantage of the strategy is to preserve SSI benefits pending the outcome of defendant's reconsideration, the disadvantage is twofold. First, the claimant may be "ill-prepared to prosecute the appeal because [the claimant] has no information." (Tr. at 49–50.) Second, any benefits paid pending the appeal constitute an overpayment if the appeal is unsuccessful, which exposes the claimant to reductions of future benefits to recoup the overpayment. (*Id.*)

Although defendant does not maintain records on the rate of reversal at the reconsideration stage of appeal, the statistics with respect to the second and third stages of administrative review show a chillingly significant rate of claimant success in reversing or remanding unfavorable determinations.

Of all decisions following a hearing held because of a claimant's appeal of an initial determination rendered over the last five years, claimants' success rate has been 66.8% in 1994, 62.9% in 1995, 54.6% in 1996, 53.9% in 1997 and 49.65% through the third quarter of 1998. (Ex. 24A.) Of all Appeals Council review decisions rendered over the last five years, claimant's success rate has been 24% in 1994, 23.2% n 1995, 17.7% in 1996, 16.9% in 1997 and 17.4% through the third quarter of 1998. (*Id.*)

Given this level of claimant success simply within the administrative review process, the remarkably low rate at which claimants seek review of eligibility decisions is noteworthy. Of the 20 million notices mailed to claimants in 1997, claimants requested reconsideration of only 2.8% of the determinations made in those notices. Hearings were held to less than 1%, and Appeals Council review was held with respect to only .2% of all notices. (Ex. 24A.) It is apparent from these statistics that many, many erroneous determinations are simply not appealed. *See David v. Heckler*, 591 F.Supp. 1033, 1044 (E.D.N.Y.1984) (Weinstein, J.).

These statistics coupled with the evidence of claimants' vulnerability show that the substantive deficiencies of the notices create an extraordinarily high risk of error. Nor can there be any doubt that their extraordinarily high risk of an erroneous deprivation would be substantially reduced by revisions to the text of the notices to remedy the omissions set forth above.

As the District of Columbia Circuit has said:

Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose—and resembles more a scene from Kafka than a constitutional process. Without notice of the specific reasons ... a claimant is reduced to guessing what evidence can or should be submitted in response and driven to responding to

every possible argument ... at the risk of missing the critical one altogether. *Gray Panthers v. Schweiker*, 652 F.2d 146, 168–69 (D.C.Cir.1980). *See also Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir.1974).

In 1992, OIG recommended that defendant "include a worksheet with all award and postentitlement [SSI] notices. This worksheet should itemize the gross payment, all deductions, the net payment amount, and the payment date." (Ex. 16 at 11.)

In a follow-up critique, OIG specifically recommended that defendant include a separate "payment worksheet" with the notice of award, the notice of change of payment, the important information notice, and the notice of planned action. (Ex. 17 at 17.)

With a budget worksheet, claimants could confirm their earned income, deemed income, federal and state living arrangement classifications, and the monthly benefits paid as a result of those classifications. Furthermore, claimants would be able to review a summary of defendant's computations and the numbers used in those computations. Without it, "claimants have no meaningful way to ascertain whether [defendant's] calculations as the grant amounts are accurate." *Schroeder v. Hegstrom*, 590 F.Supp. 121, 127 (D.Or.1984).

### Public Interest

The final factor to considered in determining whether the notices are constitutionally defective is the public interest at stake. *See Eldridge*, 424 U.S. at 347, 96 S.Ct. 893. This factor includes consideration of the fiscal and administrative burden that would be imposed on the government if the additional procedural safeguards sought by the plaintiffs are mandated and the societal impact if the status quo is maintained. *See id.* at 335, 347, 96 S.Ct. 893.

Once plaintiffs demonstrate, as they have here, that the challenged government procedures pose an unreasonable risk of erroneous deprivation to a significant private interest, the burden shifts to the government to prove that implementation of additional or substitute procedural safeguards is not in the public interest. *See Grijalva v. Shalala*, 152 F.3d 1115, 1123 (9th Cir.1998). The government here has not carried that burden.

Even if a substantial governmental burden is demonstrated, that burden alone "is not a controlling weight in determining whether due process requires a particular procedural safeguard" and "is more appropriately considered with regard to the appropriate form of relief." *Hill v. O'Bannon*, 554 F.Supp. 190, 197 (E.D.Pa.1982).

Governmental interest in preserving the public fisc and conserving administrative resources is "not overriding in the welfare context." *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1060 (E.D.Pa.1981); *Bliek v. Palmer*, 916 F.Supp. 1475, 1490 (N.D.Iowa 1996). When the most important demands of subsistence are at stake, fiscal and administrative concerns must take their place against an overriding public interest in promoting the general welfare. *Id.*

In this case, defendant's witnesses testified in general that SSA would be placed under substantial fiscal and administrative burdens if compelled to adopt the requested relief. There appears to be no dispute that the relief requested is technically feasible. Instead, the questions raised by defendant's proof are those of (1) time and (2) limited resources.

Charles Wood, Associate Commissioner of the Office of Systems Design and Development, testified "that a team of three or four [computer] programmers could write, test and debug a program that would produce a worksheet that looked like [plaintiffs' proposed worksheet] in six months." (Tr. at 95.)

Mr. Wood also testified that SSA personnel at current staffing levels would require approximately two years to implement all of plaintiffs' proposals including

the budget worksheet, the living arrangement fact sheet and the notice textual revisions. (Tr. at 103, 116–21.)

However, because predicting the time required to implement notice revisions is "not an area that I have a whole lot of knowledge about," Mr. Wood testified that his projections were based on discussions with Lorna Leigh, a computer specialist in charge of SSI computational software, and several programmers on her staff. (Tr. at 126–27.)

Ms. Leigh testified that the automation of the proposed budget worksheet "could probably be done within Mr. Gotimer's [plaintiffs' computer consultant's] six month time frame for design and development" although a worksheet of greater scope and complexity would require "more time." (Tr. at 29, 39–40.)

George Schmittle, a computer systems specialist who monitors the automation of defendant's notices, testified that "it is technically feasible" to produce the budget worksheet. Because the worksheet "would require significant redesign and significant effort," however, he added that "it is a matter of the resources that would be expended to do it." (Tr. at 489.) He could not quantify "how long it would take" or the number of "man-hours" to automate it. (Tr. at 490–91.)

Mr. Schmittle agreed with Gotimer that the budget worksheet could be produced in the "job stream" of synchronous computer programs that already perform the underlying calculations. Rather than adding further stress to defendant's overloaded SSR database, Schmittle testified that the worksheet could be accessed and stored on defendant's separate "notice retrieval system." (Tr. at 482–487.)

Bernard Wasiljov, a computer systems liaison between defendant's computer programmers and field office personnel, also agreed that "it would be possible to have the notices software basically do again everything that was already done on the job stream the first time, all these interim calculations, and take those and put them into the notice." (Tr. at 417.)

Because the notice-related computer programs must complete the production of a large daily batch of automated notices during overnight periods, Wasiljov speculated that there might be an insufficient "number of nano-seconds" during that nocturnal "window of time" to produce not only the notices, but the budget worksheets to accompany them. (Tr. 349–50, 359.) However, he testified that the time problem could be overcome if SSA opted to "buy more machines" to complete the processing during the overnight period. (Tr. at 417–18.) The quantity of costs of such machines was not established by defendant's evidence. Nor was the argument made that supplying the necessary hardware was the source of defendant's burdens. In all events, in fiscal year 1997, Congress allocated $31.7 billion to defendant to operate the SSI program. Of that sum, $26.7 billion was allocated to be spent as cash payments to eligible claimants and $5 billion was allocated to overhead expenses. (Ex. 24A at 3.)

During fiscal year 1997, defendant employed fifty-three computer systems personnel to maintain and upgrade the SSI computer systems. (Tr. at 491.) Those personnel spent eighty percent of their time "keeping the lights on," that is, preventing the present computer systems from malfunctioning. (Tr. 467–68, 493.) If their non-maintenance work time was added together, it would be equivalent to five full-time persons with responsible for upgrading the SSI computer systems to conform to legislative mandates and court orders. (Tr. at 493–494.)

In the past few years, this "team" of programmers whose work has been devoted to improving the system rather than simply maintaining it has devoted its attention principally to two sets of tasks: (1) making sure that SSA's systems are Y2K compliant, and (2) implementing charges in benefits required by the 1996 welfare reform legislation, 8 U.S.C. §§ 1601 *et seq.*

Much, if not all, of this effort has, however, now been completed, and the agency is now turning to what one witness characterized as a "slew of [projects] in the pipeline. Like I said, they were on the back burner for awhile, but now—due to legislation and Y2K—but now we are starting to pull them off and get to work on those." (Tr. at 460.) Improving the content of notices, along the lines suggested by plaintiffs is not, however, among the "back-burner" projects or part of the agency's current five-year plan. (Tr. at 460.)

The question, then, whether the need for improvements in defendant's notices along the lines sought by plaintiffs outweighs the burdens for the agency of making the necessary changes, turns on establishing the appropriate priorities between defendant's back-burner projects (recognizing that they have been delayed a number of years) and the systems upgrades required to improve the notices.

With respect to the question which projects have been waiting the longest time, it bears noting that improvements in defendant's notices have been under consideration by the agency since at least 1992, when the agency's OIG called the defects in the notices to the attention of the agency along with proposed solutions in many respects similar to those called for by plaintiffs.

The agency's own system for prioritizing among projects is, of course, entitled to deference. *Associated Gas Distributors v. Federal Energy Regulatory Comm'n,* 824 F.2d 981 (D.C.Cir.1987). The agency has an established planning process in which both the internal and external demands on the agency are evaluated, weighing "the needs of the SSA to efficiently administer the program plus [sic] the needs of our recipients. They basically identify their needs and prioritize them." However, when asked to specify the current priorities of the agency in responding to recipient needs, the agency's answer was that the needs of attorneys to speed up the process of getting paid their fees and the

needs of claimants to learn of the outcome of their internal appeals had been determined to outweigh the improvements in the basic notice. (Tr. at 461–62.) The rationale for such priorities is not apparent from the record.

Here, as in *Schroeder v. Hegstrom,* 590 F.Supp. 121, 128 (D.Or.1984), in which AFDC recipients were found to be entitled to more detailed financial information in their notices "defendant already prepares the monthly [calculations]" and "transferring this information onto the [notice] . . . is feasible . . . with some computer programming changes." While making those changes may well require the agency to postpone other improvements in its systems, the improvements do not appear of the same crucial significance as those which plaintiffs seek. Nor do they appear to demand resources beyond the agency's existing capacity. To the contrary, the record shows that the provision of adequate notice to claimants is likely to conserve the public fisc by avoiding unnecessary administrative proceedings.

In fiscal year 1997, defendant processed 527,930 requests for reconsideration and issued 130,696 administrative hearing decisions and 34,871 Appeals Council decisions. Defendant expended $367.72 to render each reconsideration determination, $1,242.03 for each administrative hearing decision, and $437.67 for each Appeals Council review. As a result, defendant spent a cumulative annual total of $385.1 million to process SSI appeals. (Ex. 24 at 77.)

Nancy Goon, a human resources manager employed by defendant to oversee the notice clearance process, testified that clearer notices could result in fewer administrative appeals. (Tr. 258–259, 315.) Rather than depleting defendant's administrative and fiscal resources, clearer notices would conserve them.

Because claimants "frequently need help understanding their notices, they frequently bring them to [defendant's field office]

with questions." According to a survey conducted by defendant in 1994, approximately 8,100 claimants per day visited defendant's field offices to request clarification of a notice. (Ex. 24 at 3.)

In the same year, claimants placed 109 million telephone calls to defendant's teleservice number at a rate of approximately 25,000 calls per day. (Ex. 24 at 5, 82.)

Defendant has estimated in its report, "Social Security Administration Business Plan Fiscal Years 1997–2001," that $100,000 can be saved for every one percent reduction in notice-related inquiries. (Ex. 24 at 120.) According to Goon, "any time you have a clearer notice, … you … cut down on calls [and] actually reduce the work load." (Tr. at 313, 319.)

In addition to fiscal and human resources, Goon also testified that "there [are also] other benefits you can't measure in dollars, but you can measure in terms of beneficial satisfaction, the reputation of the agency, [and] public good will toward the agency." (Tr. at 314.)

As another court has noted, "[i]n fact, [by] providing more complete information [on] benefits, the Government [acts] as the representative of the 'public interest.'" *Ellender*, 575 F.Supp. at 602. Accordingly, defendant serves the public interest by implementing the proposed notice improvements while the "denial of [adequate] notice serves no such important and beneficial purpose." *Bliek*, 916 F.Supp. at 1492. On the basis of the record before the Court, the relief plaintiffs seek is not unreasonably burdensome. In all events, the balance the factors relevant to due process inquiry set forth by the *Goldberg* court decidedly supports plaintiffs' claim that defendant's SSI notices are constitutionally defective. Accordingly, I find for plaintiff on the first claim for relief.

### Equal Protection Claim

■ Plaintiffs' second cause of action alleges violations of their constitutional right to equal protection because of the disparity in the quality and quantity of information that SSI claimants receive compared with that furnished TANF and AABD claimants. *Compare* 20 C.F.R. §§ 416.1336 (notice of intended action affecting SSI recipient's payment status) and 416.1404(b) (contents of initial notice of SSI eligibility) *with* 45 C.F.R. § 205.10 (regulation promulgated by the Secretary of HHS) listing the information required to be contained in notices sent by state or local agencies regarding eligibility for TANF and AABD.

However, courts have held that there is no "constitutional theory mandating general equality of opportunity," *Reichenthal v. Harris*, 492 F.Supp. 637, 643 (E.D.N.Y. 1980), or that separate regulatory programs "utilize the same eligibility requirements and limitations," *Frederick v. Shalala*, 862 F.Supp. 38, 43 (W.D.N.Y.1994). The Supreme Court "has consistently upheld the constitutionality of [social welfare] classifications` … where a rational basis existed for" the difference *Califano v. Aznavorian*, 439 U.S. 170, 174, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978).

Plaintiffs are not a suspect class and have no fundamental constitutional right to SSI benefits. *See Weinberger v. Salfi*, 422 U.S. 749, 771–72, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) ("a noncontractual claim to receive funds for the public treasury enjoys no constitutionally protected status"); *Soberal–Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir.1983).

In assessing whether there is a denial of equal protection where a suspect class or fundamental right is not implicated, the challenged action need only be rationally related to a legitimate government purpose to survive judicial review. *See id.* (citing *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)). Thus, the question is whether there is a reasonable basis for the difference in the regulatory requirements with respect to the content of notices between the two sets of federal benefit programs referred to in plaintiffs'

complaint. A reasonable basis is one that is " 'not arbitrary' " and that is based " 'upon some ground of difference having a fair and substantial relation to the object of the [regulation], so that all persons similarly circumstanced shall be treated alike.' " *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). To succeed on an equal protection challenge, plaintiffs must do more than show that the agency's stated assumptions are irrational, they must discredit any conceivable basis that could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record, *Heller v. Doe*, 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), or whether such thinking actually motivated the agency, *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Otherwise stated, once the government's action has been shown to have some plausible rationale, a court's inquiry is at an end. *See United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980).

The regulations cited by the plaintiffs as requiring that more detailed information be furnished claimants, 45 C.F.R. § 205.10, state the requirements for notices issued by states making eligibility determinations for the AFDC and AABD programs in accordance with an approved state plan. *See* 42 U.S.C. §§ 601, 603(a). The regulation was promulgated by the Secretary of HHS. The Administration for Children and Families, a component of HHS, is the federal agency responsible for overseeing state administration of the two programs. States that accept federal money to provide cash welfare payments must abide by the federal regulations in disbursing those funds to needy state residents. Part of those regulations include provisions mandating the content of notices sent by states to AFDC and AABD claimants. Those notice provisions require the inclusion of more detailed information regarding the government's determination of benefits than are required by the regulations specifying the content of SSI notices.

■ In contrast to the AFDC and AABD programs which are administered by the states, the SSI program is administered by SSA, an independent federal agency. SSA does not delegate financial eligibility determinations to a state agency. Nor does SSA impose on itself the same requirements that other federal agencies impose on state agencies administering federal programs. There is no constitutional requirement that a federal agency must impose on itself the same requirements as those which it imposes on a state agency. *See Frederick v. Shalala*, 862 F.Supp. at 43. Defendant argues that the delegation of the administration of federal programs to a variety of states participating in the programs mandates greater supervision and regulation of the state agencies by HHS and that this need for greater supervision and regulation explains the heightened notice requirements in the AFDC and AABD programs. Plaintiffs have not responded to that argument.

At trial, plaintiffs provided no evidence to rebut defendant's rational basis much less show that no conceivable rational basis exists to support the difference in notice requirements. Indeed, plaintiffs failed to address the differences between SSI's purely federal administration and involvement of the states in the administration of AFDC and AABD programs. Since the rational basis articulated for the distinctions between the regulations with respect to notice has not been rebutted, plaintiffs' equal protection claim must fail.

## CONCLUSION

For the reasons set forth above, I find that defendant's notices to SSI claimants violate the due process clause of the Fifth Amendment of the United States Constitution. Plaintiffs' claim of a violation of equal protection fails because defendant

demonstrated a rational basis for the difference in notices sent to SSI claimants and AFDC and TANF claimants. The second claim is accordingly dismissed. Defendant is ordered to modify the notice sent to claimants in accordance with this opinion. The time frame for implementation of this order and the precise content of the notices shall be the subject of immediate discussions between the parties. In the event the parties are unable to reach agreement, plaintiffs are directed submit a proposed judgment on notice within thirty days of the date receipt of this Memorandum Decision and Order.

SO ORDERED.