*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHAEL ROSEN; SANFORD BLOCH; MARK LEVINE,
*Plaintiffs-Appellees /*
*Cross-Appellants,*

*v.*

M. D. GOETZ, JR., Commissioner, Tennessee
Department of Finance and Administration,
*Defendant-Appellant/*
*Cross-Appellee.*

Nos. 05-5633/5779

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00627—William J. Haynes, Jr., District Judge.

Argued: May 24, 2005

Decided and Filed: May 27, 2005

Before: COLE and SUTTON, Circuit Judges; ZATKOFF, District Judge.[*]

---

## COUNSEL

**ARGUED:** Charles J. Cooper, COOPER & KIRK, Washington, D.C., for Appellant. G. Gordon Bonnyman, Jr., TENNESSEE JUSTICE CENTER, Nashville, Tennessee, Edmund L. Carey, Jr., BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, for Appellees. **ON BRIEF:** Charles J. Cooper, Michael W. Kirk, COOPER & KIRK, Washington, D.C., Linda A. Ross, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, Ronald G. Harris, Aubrey B. Harwell, Jr., NEAL & HARWELL, Nashville, Tennessee, for Appellant. G. Gordon Bonnyman, Jr., Russell J. Overby, TENNESSEE JUSTICE CENTER, Nashville, Tennessee, Edmund L. Carey, Jr., George E. Barrett, BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, Andrew Dunlap, Sarah Reynolds, KIRKLAND & ELLIS, New York, New York, Margaret M. Huff, Nashville, Tennessee, Michael Cohan WELFARE LAW CENTER, New York, New York, for Appellees. Mark B. Stern, Dana J. Martin, U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, Washington, D.C., for Amicus Curiae.

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

—————————

**OPINION**

—————————

PER CURIAM.  The State of Tennessee appeals a district court order enjoining it from beginning the process of disenrolling members from its Medicaid program, which is known as TennCare.  The district court held that the State's disenrollment procedures, which have been approved by the federal Centers for Medicaid and Medicare Services (CMS), violate (1) a 2001 consent decree requiring compliance with certain federal Medicaid regulations and (2) the Due Process Clause of the United States Constitution.  Because the State's procedures comply with the applicable Medicaid regulations and with CMS's own interpretation of those regulations and because the State's procedures otherwise comply with the due process requirements set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), we reverse.

I.

A.

This case has its genesis in a March 2001 consent decree entered into by the State and the plaintiff class, which represents all beneficiaries of TennCare.  The consent decree enjoins the State

> from terminating, reducing or suspending the TennCare coverage of members of the plaintiff class who are enrolled in the TennCare program, without affording such individuals notice and an opportunity for a hearing in accordance with 42 C.F.R. Part 431, Subpart E.

JA 129.  *See generally Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918 (6th Cir. 2002) (describing the litigation that led to the consent decree).

On January 10, 2005, Tennessee's Governor, Phil Bredesen, informed the public that a severe budgetary shortfall, together with the State of Tennessee's constitutionally mandated balanced budget requirement, would require the State to eliminate three of the seventeen TennCare eligibility categories and to disenroll 323,000 beneficiaries from the TennCare program.  TennCare is the State of Tennessee's federally approved Medicaid demonstration project, through which the State extends health care benefits above and beyond federal requirements.  *See* http://www.cms.hhs.gov/medicaid/1115/tnfact.pdf (CMS fact sheet describing the TennCare program).  Due to expansions of the program since 1994, Tennessee's Medicaid program is the nation's most generous, providing health care to one-fifth of the State's population.  It also has consumed 33.9 and 33.3 percent of the State's total spending over the last two years, the highest of any State in the country and well in excess of the national averages (21.4 and 21.9 percent, respectively) during those years.  Current projections, according to the Governor, show that the TennCare program's expenses during fiscal year 2006 would (if left unchanged) increase by $650 million in state funds, a figure exceeding the State's growth in total revenue by approximately $325 million.  An increase in TennCare spending of this magnitude, the Governor concluded, would prompt large cuts to the remainder of Tennessee's budget—to education, transportation, public safety and other programs—in view of Tennessee's balanced budget requirement. *See* Tenn. Const. art. II, § 24.

Within days of this announcement, the district court on its own initiative determined that the consent decree barred the disenrollment proposal and enjoined the State from commencing the disenrollment process, a decision that the State appealed to the Sixth Circuit on January 31, 2005.  At this point, a group of individuals successfully moved to intervene in the case on behalf of a class of individuals who would be subject to the disenrollment proposal.  While the plaintiffs-intervenors

did not favor the TennCare changes, they took the position that the disenrollment process should not be enjoined because immediate implementation of Governor Bredesen's proposal would permit the State to minimize the number of TennCare members that the State proposed to cut from the program this year.

On April 12, 2005, at the urging of the State and the plaintiffs-intervenors, we reversed the injunction. *Rosen v. Goetz*, No. 05-5202, 2005 U.S. App. LEXIS 6444 (6th Cir. Apr. 12, 2005). We held that the district court had mistakenly assumed authority under the 2001 consent decree to limit the State's substantive policy choices in deciding whether to eliminate certain types of "expanded" or "optional" Medicaid coverage, which is to say a State's provision of Medicaid benefits that federal law does not require participating States to provide. *See* 42 U.S.C. § 1315(a) (2005) (authorizing the waiver of certain federal requirements for "demonstration" projects that "assist in promoting the objectives" of the Medicaid system); *see generally Pharm. Research & Mfrs. of Am. v. Thompson*, 313 F.3d 600, 602 (D.C. Cir. 2002). In reaching this conclusion, we noted that the consent decree gave the district court authority to determine whether the State's *procedures* for disenrolling TennCare beneficiaries complied with Part 431 of the Medicaid regulations but did not give it authority to question the State's *substantive* policy decision whether to eliminate certain forms of non-mandatory Medicaid coverage. *See Rosen*, 2005 U.S. App. LEXIS 6444, at *12–13.

B.

Consistent with this decision, the district court on remand examined whether the State's proposed disenrollment process complied with Part 431 of the Medicaid regulations and the Due Process Clause. *See* 42 C.F.R. § 431.205(d) (2005) (requiring that a State Medicaid agency's hearing system "must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart"). In making this assessment, the district court held an evidentiary hearing, which among other things allowed the State to outline the process by which it planned to disenroll certain TennCare recipients. As early as June 1, 2005, the State plans to begin mailing three different notices to members of the plaintiff class about the disenrollment process: a Request for Information (RFI), a Verification Request and a Termination Notice. All three of the notices have been written in a way that ensures they are comprehensible to individuals who have a sixth-grade reading level. Each TennCare recipient who has not been identified by the State as eligible to receive benefits under another Medicaid category and who is therefore scheduled for disenrollment will receive a 14-page RFI packet. The RFI informs beneficiaries that their eligibility category for TennCare is ending and that they may continue to receive benefits only if they qualify for an open Medicaid category. The recipient then must complete a 7-page form within 30 days, provide proof of income and resources, provide a statement completed by employers and provide proof of pregnancy or special health conditions. The RFI informs beneficiaries that the State has the discretion to extend the 30-day submission time frame for good cause on a case-by-case basis. The point of this information exchange is to help the State determine whether a given TennCare beneficiary is eligible for benefits under another Medicaid program. JA 586.

If a recipient fails to complete the RFI fully, the State will send the beneficiary a Verification Request, informing the recipient that he or she has ten extra days to respond. JA 648. If the beneficiary does not respond at all or if the response establishes that the beneficiary is not eligible for an open Medicaid category, the State will send a Termination Notice 20 days in advance of the termination date that specifies the reasons why the enrollee is being terminated. The Termination Notice will inform beneficiaries that they have 40 days in which to request a hearing to resolve factual disputes related to termination (and that their coverage will continue until their appeal is resolved if they appeal and request an evidentiary hearing within 20 days).

The State will then route any requests for a hearing to the Tennessee Department of Human Services (DHS), where an employee known as a "Conciliation Specialist" will determine whether the hearing request is timely and whether it raises a "valid factual dispute"—which the State defines as "a dispute, [that] if resolved in favor of the appellant, would prevent the state from taking the adverse action that is the subject of the appeal." D. Ct. Op. at 25. If the Conciliation Specialist determines that there is a legitimate factual dispute about the TennCare member's eligibility to participate in another Medicaid program, the evidentiary hearing will go forward. Otherwise, the appeal will be sent to another DHS employee, a "Conciliation Attorney." If the Conciliation Attorney also decides that there is not a "valid factual dispute" requiring an evidentiary hearing, then the State will send the beneficiary a letter asking for additional clarification in ten days, without which the State will not conduct a hearing. If and when the beneficiary does respond, the Conciliation Specialist will again determine whether there is a "valid factual basis" for the evidentiary hearing. If no such basis exists, the State will dismiss the appeal.

The State also has proposed specific procedures for accommodating the approximately 30,000 individuals slated for disenrollment who have been assessed within the past year as being Severely and Persistently Mentally Ill (SPMI). The notice mailed to all TennCare beneficiaries asks them whether they have a disability. If so, it offers them the use of a TennCare Partners Advocacy Line, which SPMI individuals may call to seek advice about the disenrollment process. The letter also notifies SPMI individuals that they may request an extension to complete the RFI or to ask for help generally. On top of this, the State plans to attempt to identify each SPMI individual by contacting them through the Community Mental Health Center at which they most recently received care. The RFI also explains how SPMI individuals or beneficiaries with limited English proficiency may seek assistance in completing the forms and in understanding the disenrollment process.

The Secretary of the United States Department of Health and Human Services has delegated to CMS the authority to promulgate regulations implementing the Medicaid provisions of the Social Security Act as well as to enforce them. On March 24, 2005, after several meetings with federal officials and after modifying aspects of its disenrollment procedure in accordance with CMS's requirements and suggestions, CMS gave the State approval to use this disenrollment process. JA 626.

C.

On April 28, 2005, the district court held that the State's proposed termination procedures violated federal Medicaid regulations and the Due Process Clause of the Fourteenth Amendment. It identified the following deficiencies in the State's disenrollment procedure:

1. The State's failure to inform enrollees of an extension of the 30 day period by the State in the request for information form violates the Plaintiffs' procedural due process rights and 42 C.F.R. § 431.210(a)–(c).

2. Absent additional proof, the State's notices to SPMI enrollees violate those enrollees' procedural due process rights and 42 C.F.R. § 431.210.

3. The State's verification request violates due process by failing to display prominently the acceptability of alternative forms of proof of eligibility.

4. The State's notices of termination violate due process by failing to disclose the specifics of any defect in the enrollee's response and failing to give adequate notice in its description of the appeal process.

5. The State's hearing and appeals procedures violate due process and 42 C.F.R. § 431.220(a).

6. The State's hearing procedure violates due process and 42 C.F.R. §§ 431.221 and 431.242 by failing to provide a hearing unless the beneficiary responds to a request for clarification.

7. The State violates due process by failing to provide a neutral and impartial hearing officer.

8. The State's unfunded protocol to provide accommodations for SPMI enrollees violates the district court's earlier ruling in *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 280 F. Supp. 2d 743, 832–34 (M.D. Tenn. 2002).

*See* D. Ct. Order at 1–2.

In a later order, the district court clarified that it was holding that all appeals must be heard by an administrative law judge from the Tennessee Secretary of State's office and that the State could not deny hearings simply because a TennCare recipient failed to submit a completed information form. (That order was separately appealed and has been consolidated with this appeal.) In response, the State explained to the district court that neither the Medicaid regulations nor the Constitution required these modifications and that they would potentially require a hearing for all 323,000 of the disenrolled beneficiaries, a process that would deny the State the needed savings to balance the budget and would scuttle the State's (and plaintiffs-intervenors') efforts to minimize the number of disenrolled beneficiaries. Because the State refused voluntarily to comply with its order, the district court enjoined the State from sending out notices beginning the termination process.

As these proceedings were ongoing in the district court, the State and plaintiffs-intervenors, along with two hospital associations and several safety-net hospitals, entered into a Memorandum of Understanding (MOU) on April 26, 2005. Under the terms of the MOU, the State proposes to continue medical coverage for 97,000 to 100,000 medically needy persons over the next two years through a new Waiver-Based Spend Down Program. Among approximately two dozen conditions, the MOU was made contingent on (1) approval of additional funds by the Tennessee legislature, (2) timely and favorable rulings in this case and (3) a successful effort to modify a consent decree in *Grier v. Goetz*, No. 79-3107 (M.D. Tenn.), *see Rosen*, 2005 U.S. App. LEXIS 6444, at *13, which places substantive restrictions on the State's ability to alter certain Medicaid benefit levels.

On May 6, 2005, at the urging of the State and the plaintiffs-intervenors, we stayed the district court's injunction and expedited consideration of the appeal. The State does not challenge and has agreed to comply with two of the district court's eight conclusions quoted above—its requirement that the RFIs disclose that enrollees may take an additional 10 days to supplement incomplete information (conclusion one of the district court's decision) and its requirement that the Verification Request form disclose the acceptability of alternative forms of proof of eligibility (conclusion three of the district court's decision). And plaintiffs do not defend conclusion eight of the district court's decision. The remaining bases for the district court's injunction fall into three broad categories: those concerning the State's procedures with respect to evidentiary hearings, those concerning the content of the Termination Notices and those concerning the accommodation of SPMI beneficiaries. For the reasons that follow, we reverse.

## II.

### A.

In defending the district court's decision, the plaintiffs first argue that the State, when eliminating a non-mandatory Medicaid program, must provide all recipients a pre-termination hearing to determine whether they remain eligible for coverage under another Medicaid program. We disagree.

In relevant part, the Medicaid regulations in Part 431 provide that:

(a) The State agency must grant an opportunity for a hearing to the following:

. . .

(2) Any recipient who requests it because he or she believes the agency has taken an action erroneously.

. . .

(b) The agency need not grant a hearing if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all recipients.

42 C.F.R. § 431.220. These provisions apply where, as here, a State takes an "action," which the regulations define as "a termination, suspension, or reduction of Medicaid eligibility or covered services." *Id.* § 431.201.

As the plaintiffs see it, the exception to the hearing requirement (§ 431.220(b)) does not apply when the State proposes to eliminate one Medicaid program and a beneficiary claims continued eligibility under another program, even if the beneficiary fails to allege a "valid factual dispute" about her eligibility for this other form of Medicaid coverage. All beneficiaries threatened with disenrollment, in other words, are entitled to a hearing—so long as they request one. As the State sees it, the government need not provide hearings to beneficiaries who have failed to raise a "valid factual dispute" about their eligibility for coverage under another Medicaid program.

We accept the State's reading of the regulations for several reasons. For one reason, no party has argued that this interpretation exceeds the agency's authority under the pertinent statute. *See* 42 U.S.C. § 1302(a) (2005) (authorizing the Secretary of Health and Human Services to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of [his or her] functions"). For another reason, this approach plausibly interprets the language of the regulations. The regulations grant a broad right to an evidentiary hearing (when a recipient believes that the agency has "taken an action erroneously" in terminating benefits, § 431.220(a)(2)) and impose a broad limitation on that right (when the sole issue is a law "requiring an automatic change" in benefits, § 431.220(b)). An interpretation of the regulations that invariably respects a recipient's claim that "erroneous[]" action has been taken, even when the termination of benefits arises solely from a change in state or federal law, necessarily slights the provision stating that a hearing need not be given in the face of "an automatic change" in benefits. By contrast, a reading of the regulations that draws a dichotomy between impermissible challenges to a State's legal or policy judgment on the one hand and permissible challenges to the relevant facts or application of law to a given beneficiary respects *both* regulations.

For still another reason, this reading adheres to precedent. In construing a predecessor version of these regulations, we have held that "matters of law and policy," as opposed to matters of fact or the application of law, "are not subject to any hearing requirements under the applicable regulations, whether the hearing be pre- or post-reduction." *Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978) (holding that "when a state decides to terminate optional benefits on the basis of lack of appropriated funds, or for any other state reason, this is a matter of state law or policy which it was permitted to adopt").

All of this is prelude, however, to the principal explanation for our decision. In interpreting these regulations and in ascertaining whether the State has complied with them, we do not write on a blank slate. CMS, the agency that authored and promulgated the regulations, has approved the State's policies as fully compliant with its regulations, a determination to which we owe "substantial

deference." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 646 (6th Cir. 2004); *see also id.* at 643–44 (holding that an "agency's interpretation of its own regulation is entitled to 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943–44 (6th Cir. 2000) (giving deference to CMS manual); *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 595–96 (5th Cir. 2004) ("As the agency entrusted with the administration of the Medicaid statute, CMS is required to determine that each state plan is in conformity with the specific requirements of the Medicaid act."); *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002) (CMS "reviews each plan to assure that it complies with a long list of federal statutory and regulatory requirements"); *Pharm. Research & Mfrs. of Am.*, 362 F.3d at 822.

CMS has conveyed its interpretation of these regulations in three ways. First, it reviewed and expressly approved the State's proposed disenrollment process, including its hearing and appeals procedures. *See* JA 628 (approving, contingent on compliance with enclosed procedures, Tennessee's requests for eligibility amendments to TennCare); *see also id.* at 645 (listing as one of those procedures that "the State will grant hearings only for those enrollees raising valid factual disputes related to the termination"). Second, at our invitation, it filed an *amicus curiae* brief in this case, explaining that Tennessee's proposed procedures are consistent with its regulations. "By permitting a hearing when an enrollee raises a valid factual dispute," CMS writes, "the proposed procedures ensure that an enrollee will receive a hearing to contest factual matters pertaining to their particular eligibility to continued enrollment" but "relieve[] the state agency of the need to provide pro forma hearings for those enrollees who are . . . challenging only the program-wide changes that automatically end their enrollment eligibility." CMS Br. at 20–21. Third, CMS's Medicaid manual for state agencies expressly embraces this interpretation. *See* CMS State Medicaid Manual § 2902.4 (instructing States to "[d]etermine whether the appeal involves issues of law or policy, or issues of fact or judgment. The decision will affect whether a hearing is granted and whether Medicaid will be continued pending the hearing decision"), *available at* http://www.cms.hhs.gov/manuals/45_smm/pub45toc.asp.

*Soskin v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004), is not to the contrary. In *Soskin*, the State of Colorado proposed an elimination of Medicaid coverage for legal aliens living in the State and determined that it would deny hearings in all cases in which an affected beneficiary claimed that the disenrollment was in error, without regard to whether the beneficiary could establish a valid factual dispute about eligibility for coverage or not. Here, by contrast, the State *will* grant hearings to affected beneficiaries so long as they raise a valid factual dispute about their continued eligibility for coverage, as opposed to a mere challenge to the change in law or policy. Consistent with this approach, *Soskin* itself distinguished our decision in *Benton* on this precise ground. *See* 353 F.3d at 1263 (distinguishing *Benton* on the ground that "the *sole issue*" in that case "was legal, not dependent upon the factual circumstances of individual recipients"). No less importantly, the plaintiffs in *Soskin* did not take on the daunting task that the plaintiffs seek to shoulder here—asking us to override CMS's interpretation of its own administrative regulations.

B.

Plaintiffs respond that this interpretation of the regulations would violate the constitutional due process requirements set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970). *See* 42 C.F.R. § 431.205(d) (requiring that a State Medicaid agency's hearing system "must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart"); *cf. Shepard v. United States*, 125 S. Ct. 1254, 1263 (2005) (interpreting statute to avoid "serious risks of unconstitutionality"). Due process, it is true, requires "the opportunity to be heard . . . at a meaningful time and in a meaningful manner" before the termination of public assistance payments. *Goldberg*, 397 U.S. at 267 (quotations and citations omitted). But, at the same

time, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In this instance, plaintiffs have not shown that the requirement of establishing a valid factual dispute before being entitled to a hearing violates due process.

*Goldberg*, to start with, does not sustain the plaintiffs' position. In that case, the Court declined to reach the issue of "whether due process requires only an opportunity for written submission, or an opportunity both for written submission and oral argument, where *there are no factual issues in dispute* or where the application of the rule of law is not intertwined with factual issues." *Goldberg*, 397 U.S. at 268 n.15 (emphasis added).

And since *Goldberg*, the Court has explained that the due process requirement that the government provide a hearing before the termination of benefits turns on the sensible fact/law dichotomy that CMS, the State and *Benton* have drawn. In order for "the hearing mandated by the Due Process Clause [ ] to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." *Codd v. Velger*, 429 U.S. 624, 627 (1977) (holding that evidentiary hearing was unnecessary where a discharged employee did not raise a factual dispute about the terms of his discharge).

In a more general way, *Mathews v. Eldridge* also supports the State's and CMS's position, as it reminds courts to consider "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards." 424 U.S. at 343. "[P]rocedural due process rules," after all, "are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344. And "the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." *Id.* at 348; *see generally* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267 (1975).

In applying this pragmatic approach, *Mathews* upheld "carefully structured procedures" that permitted the Secretary of Health, Education and Welfare to disenroll individuals from Social Security's disability benefits program without a hearing. *Id.* at 346. Among other protections, the government relied on the following to guard against erroneous terminations of benefits: (1) a "detailed questionnaire . . . identifying with particularity the information relevant to the entitlement decision," (2) the "recipient [was] invited to obtain assistance from [a] local [ ] office in completing the questionnaire," (3) "the information critical to the entitlement decision usually is derived from medical services" and was "communicate[d] more effectively through written documents" than oral presentations and (4) the "[o]pportunity [was] then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file." *Id.* at 345–46.

No less than the procedures at issue in *Mathews*, Tennessee's procedures are "carefully structured" to determine who should receive a hearing and who should not. The State, as an initial matter, has culled its own records to ensure that individuals eligible for an open Medicaid program are not disenrolled when the State eliminates three categories of TennCare coverage. After this initial review, the State asks affected TennCare recipients for information that would indicate whether they are eligible for another Medicaid program, asks for that information again and at all points permits a request for a hearing if a beneficiary presents a "valid factual dispute" about their continued eligibility for coverage. In implementing this "valid factual dispute" inquiry, the State has assured us, (1) a recipient will not be required to establish Medicaid eligibility in order to be entitled to a hearing and (2) a recipient will be entitled to all reasonable inferences, in other words the benefit of the doubt, in determining whether a material fact dispute has been established or

whether a material dispute about the application of the regulations to a given fact pattern has been established. These "good-faith judgments," *id.* at 349, are a far cry from the complete absence of any similar protections in *Goldberg* and suffice to establish the constitutionality of CMS's and the State's interpretation of the Medicaid regulations.

C.

The plaintiffs' other contentions relating to the hearing procedure also come up short. They next challenge the State's requirement that potential disenrollees fill out information forms in order to retain eligibility in another Medicaid category. But what else is the State to do? The State initially plans to review TennCare records on its own to determine whether a disenrolled individual is eligible for another form of Medicaid coverage. If eligibility is established, the individual will receive continued coverage. If State records fail to identify a basis for continued coverage, the State *must* obtain information from the individual to ascertain whether another form of coverage applies. Plaintiffs have failed to identify any Medicaid regulations, or for that matter any CMS interpretations of those regulations, that support a contrary view.

Nor is this approach inconsistent with *Soskin*. There, the State refused to grant a hearing to an individual who failed to return the requested information even if the individual raised a fact dispute about the request—for example, whether it had been sent to the individual. *See Soskin*, 353 F.3d at 1263 (noting that individuals would not receive hearings if they "assert[ed] that they did return the form but that the county lost it or failed to process it" or asserted "that they never received either of the two redetermination forms that the county allegedly mailed"). Here, the State concedes that individuals who establish a valid factual dispute about the request for information—for example, whether they ever received it—may obtain a hearing to resolve the issue. *See* JA 645 (defining "valid factual disputes" to include circumstances in which the State sent the Expiration Notice to the wrong address, the enrollees received the Expiration Notice in error, the State failed timely to process information submitted by the enrollee or the State granted a good cause extension of time but failed to extend the time).

Plaintiffs are similarly mistaken in contending that the State has violated the Medicaid regulations by using DHS attorneys to decide whether an enrollee raises a valid factual dispute. Section 431.230(a) of the regulations, the plaintiffs rightly point out, provides that a hearing officer may "determine[] *at the hearing* that the sole issue is one of Federal or State law or policy." (Emphasis added.) But § 431.220(b) explicitly says that "[t]he agency *need not grant a hearing* if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all recipients," without specifying who makes that decision. (Emphasis added.) The plaintiffs' argument that only the hearing officer may make that decision reads out of the regulations § 431.220(b) and the State's ability, before a hearing, to determine whether "the sole issue is a Federal or State law requiring an automatic change." The two provisions simply are not mutually exclusive. That a hearing officer may decide "at the hearing," *see* § 431.230(a), that a hearing is no longer required does not preclude the State from delegating to another state employee the screening task of determining whether "[t]he agency need not grant a hearing," *see* § 431.220(b), in the first instance.

Relatedly, the district court found fault with the State's procedure because it did not require this screening function to be performed by attorneys from another state agency—for example, administrative law judges employed by the Tennessee Secretary of State. The plaintiffs do not defend this aspect of the district court's decision—and correctly so. As CMS points out, the relevant statutes require that state Medicaid plans "provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan," 42 U.S.C. § 1396a(a)(5), and provide that the state plan must "provide for granting an opportunity for a fair hearing before the State agency," 42 U.S.C. § 1396a(a)(3). CMS, to its credit, has identified one potential wrinkle

in the hearing process—namely, whether the DHS attorney who performs this screening function is employed by the single state agency that administers the TennCare program. *See* CMS Br. at 25 n.9. Neither the plaintiffs nor the district court registered a complaint about this aspect of the program, and the State assured us at oral argument that it would work with CMS to address and, if necessary, resolve this issue.

Nor, contrary to plaintiffs' suggestion, has there been any showing that the DHS attorneys who will screen the request have a conflict of interest at this stage of the litigation or that there is any other reason why administrative law judges or attorneys from another state agency must handle this fact-dispute screening function. Until proven otherwise, the Supreme Court has explained, we must start with the assumption that government employees tasked with performing an adjudicatory or quasi-adjudicatory function will do so fairly and impartially. *See Schweiker v. McClure*, 456 U.S. 188, 196–97 (1982) (holding that courts "must start [ ] from the presumption that [ ] hearing officers . . . are unbiased"); *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1360 (6th Cir. 1991). CMS also did not find fault with this aspect of the disenrollment procedure when it approved the State's plan and its State Medicaid Manual appears to countenance this type of procedure. *See* CMS Br. at 26; *see also* CMS State Medicaid Manual § 2902.7 (The "State official or panel conducting the hearing shall not have been connected in any way with the previous actions or decisions on which the appeal is made. For example, a field supervisor who has advised the local agency in the handling of a case would be disqualified from acting as the hearing officer, however *a different field supervisor could serve*.") (emphasis added).

III.

The plaintiffs next argue that the contents of the Termination Notice violate Part 431 and their due process rights by failing to provide specific, individualized reasons supporting the agency's conclusions. We disagree.

The applicable regulations establish that the Termination Notices must include (1) "[a] statement of what action the State . . . intends to take"; (2) "[t]he reasons for the intended action"; (3) "[t]he specific regulations that support, or the change in Federal or State law that requires, the action"; (4) "[i]n cases of an action based on a change in law, the circumstances under which [an evidentiary] hearing will be granted"; (5) and "[a]n explanation of the circumstances under which Medicaid is continued if a hearing is requested." 42 C.F.R. § 431.210. The Termination Notices include all of this information and accordingly comply with this regulation. In attempting to counter this point, plaintiffs argue that the notices do not say that TennCare members will receive a hearing whenever one is requested, regardless of whether a valid factual dispute is alleged. But, as shown, the regulations do not require hearings in that kind of a setting and accordingly the notices need say no such thing.

Plaintiffs persist that, even if the Termination Notices comply with the letter of the regulations, they fail to satisfy the due process requirements of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"), because they do not include sufficiently specific facts—apparently because they do not inform TennCare members both why they are being disenrolled and why they are not eligible for benefits under another Medicaid program. But the very facts that the plaintiffs claim are missing are supplied by the State through a second letter that follows the Termination Notice and that the Termination Notice itself references and brings to the attention of recipients. *See Garrett v. Puett*, 707 F.2d 930 (6th Cir. 1983). Due process does not require "reasonably calculated" notice to come in just one letter, as opposed to two.

IV.

Plaintiffs, finally, argue that the State violates the *Mullane* due process requirement, 339 U.S. at 314, by "proposing the same fourteen-page RFI for the SPMI population as it proposes for all other recipients." Plaintiff Br. at 40. But the fact that SPMI individuals receive the *same* notice as other recipients does not in and of itself raise due process concerns if that notice, however widely distributed, is "reasonably calculated" to inform SPMI enrollees of the pending process.

Plaintiffs' case citations also do not support this argument. In *Covey v. Town of Somers*, 351 U.S. 141 (1956), the Court identified a due process violation where the State provided notice of judicial foreclosure through simple mailing and nothing more, "[a]lthough [the taxpayer] was known by the officials and citizens of the Town of Somers to be a person without mental capacity to handle her affairs or to understand the meaning of any notice served upon her, [and] no attempt was made to have a Committee appointed for her person or property until after entry of the judgment of foreclosure in this proceeding." *Id*. at 146. And in *Parker v. Califano*, 644 F.2d 1199 (6th Cir. 1981), this court remanded a due process claim for further consideration when a social security applicant with mental illness received a standard denial of benefits notice requiring her to file an appeal within six months, with no notice accommodations to account for her mental illness. *See id*. at 1200, 1203.

Here, however, the RFI seeks to account for SPMI enrollees and non-SPMI enrollees alike. The RFI's cover letter includes this passage: "**Do you have a mental illness?** The TennCare Partners Advocacy Line can help you. Call them for free at **1-800-758-1638**." JA 405. And on page 13 of the RFI, under the section entitled "Do you need special help?" it states: "**Do you have a disability**, learning problem, or mental health problem? If you need any help with TennCare, call the Family Assistance Service Center. . . . [providing phone numbers]." *Id.* Nor does the State wait to receive a phone call to assist an SPMI enrollee with the response process. As the district court noted:

> For each SPMI enrollee, TennCare and DMHDD [Tennessee's Department of Mental Health and Developmental Disabilities] will identify the Community Mental Health Center ("CMHC") which most recently provided services to the enrollee. The DMHDD will also provide this information to the TennCare Partners Advocacy Line ("TPAL"). TPAL informs the CMHCs in advance of those SPMI enrollees who will be receiving requests for information. Thus, the CMHC[] is expected to expedite an outreach for the response process.
>
> The state will rely on TPAL and [CMHCs] to [contact] all enrollees who are legally designated SPMI so as to enable those enrollees to navigate the eligibility process. . . . If a CMHC is unable, unwilling, or unavailable to perform outreach for any reason, then TPAL will perform that function.

JA 403–04 (citations omitted).

Plaintiffs also argue that the 30-day period for responding to the RFI is too short for members of the SPMI population. But that is just the *initial* response period. As the RFI makes clear, SPMI individuals may freely seek extensions of the response period. On top of that, the 30-day period for responding to the RFI is more than four times the seven-day period permitted by *Goldberg*, 397 U.S. at 268, three times the ten-day period required by regulation, 42 C.F.R. § 431.211, and equals or exceeds the periods afforded by other States*, see* JA 492 (noting that Illinois provides only 21 days for return of a form to reverify eligibility and Missouri provides 10 days). On this record and under these circumstances, the express accommodations provided by the

RFI together with the State's specific outreach to the SPMI population satisfy the *Mullane* "reasonably calculated" standard.

* * * * *

In reaching these conclusions, it is not lost on us that the implementation of the State's disenrollment process will cause hardship for numerous Tennesseans. When a State to its credit achieves the status of becoming one of the most generous providers of Medicaid services in the nation, it may occasionally happen that the zero-sum fiscal realities of administering a state budget will prohibit the State from sustaining that level of support. If that should happen, it is not for the federal courts to compel the State to maintain non-mandatory Medicaid programs that it no longer can support. So long as the State's disenrollment process satisfies the requirements of the Medicaid regulations and statute, any relevant consent decrees and the Constitution, those policy choices must be left to the elected representatives of the residents of the State.

In addressing whether the State's disenrollment procedures satisfy these requirements, we have concluded that on their face and with respect to all of the SPMI population they indeed satisfy them. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (holding that in a facial challenge plaintiffs must show that "no set of circumstances exists" under which the statute can be implemented constitutionally). That conclusion, however, does not prohibit an individual TennCare recipient, who is not treated in accordance with these requirements or for whom it is uniquely inappropriate to apply these requirements, from bringing a specific as-applied challenge to the disenrollment process. *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003). We resolve only whether these procedures may be applied to TennCare recipients in general or to the SPMI population as a whole.

Throughout this appeal, plaintiffs have urged us to ignore the MOU and the 100,000 or so TennCare recipients that may be spared the hardship of initial disenrollment if the State is allowed expeditiously to proceed with its proposed changes to the TennCare program. In their view, the MOU contains numerous speculative conditions and is otherwise unenforceable in its current state. In expediting this appeal and in expediting the decision below, the federal courts have strived to eliminate one of those conditions. And whether the MOU happens to be an enforceable agreement need not detain us at this point. A State that chooses to be one of the most generous in the country in providing non-mandatory Medicaid services strikes us as an improbable candidate for backing out of such a commitment in bad faith. And elected officials who choose to play fast and loose with such an agreement, we suspect, would face more risks than any federal lawsuit can bring.

For these reasons, we reverse.