Carmen S. BAKER and Catherine Burt-
ness, on behalf of themselves and all
those similarly situated, Petitioners,

v.

STATE of Alaska, DEPARTMENT OF
HEALTH AND SOCIAL SERVICES,
Karleen Jackson, in her official capacity
as Commissioner of the Department, Di-
vision of Senior and Disabilities Ser-
vices, and Rod Moline, in his official
capacity as Director of the Division, Re-
spondents.

No. S–12598.

Supreme Court of Alaska.

Aug. 29, 2008.

James J. Davis, Jr., and Goriune Dudukgi-an, Northern Justice Project, Anchorage, for Petitioners.

Joanne M. Grace, Assistant Attorney General, Anchorage, and Talis J. Cólberg, Attorney General, Juneau, for Respondents.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

### I. INTRODUCTION

In 2006 the State of Alaska's Department of Health and Human Services implemented changes in the administration of its Personal Care Attendant program which resulted in the termination or reduction of in-home care services to over 1,000 individuals. This class action challenges the sufficiency of the no-

tices sent by the state to those individuals whose services were reduced. Because the notices did not sufficiently explain the reasons for reductions in service, we hold that they failed to comply with constitutional and regulatory requirements. Accordingly, we reverse the decision of the superior court and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. The Personal Care Attendant Program

Through Medicaid, the State of Alaska provides personal care assistance to low-income, disabled Alaskans who cannot independently perform basic tasks of daily life such as eating, bathing, and using the toilet. The purpose of the Personal Care Attendant (PCA) program is to "enable an individual, of any age, whose needs would otherwise result in placement in an acute care hospital or nursing facility or loss of that individual's employment solely related to activities of daily living (ADL) to remain at home or prevent job loss."[1]

Until recently, an individual's PCA needs were assessed ad hoc by one of several nongovernmental PCA-service providers. There was little or no uniformity among service providers or oversight from the state, so recipients with similar needs could receive "vastly different levels of service." It is not clear from the record in this case how often recipients' needs were reevaluated under this regime.

In 2006 the state legislature—concerned that program funding was not being evenly or judiciously distributed—directed the De-

partment of Health and Human Services to overhaul the program's administration. In order to establish standards for determining (1) initial eligibility for PCA services and (2) how many service hours to provide, the department developed the "Personal Care Assessment Tool" (PCAT), an objective assessment tool to evaluate the actual needs of recipients on an annual basis.[2] The PCAT is a thirteen-page worksheet-like form that is filled out by a state-contracted registered nurse (assessor) on the basis of information gathered during a personal interview with a current or prospective PCA-service recipient in that person's home. During the interview, the assessor personally observes the individual in her home environment and asks questions of the individual and the individual's caregivers and family members about the individual's living situation, abilities and disabilities, cognition, behavior, nutrition, and medical needs. From this raw information, the assessor assigns a numerical "code" to each of hundreds of items on the PCAT form.[3] The assessor uses "some of [these numbers] to score eligibility for PCA services," and, if the individual is deemed eligible, the assessor "may refer to the numbers . . . in determining the amount of PCA services a recipient needs."

The final result of this process is a "PCAT Authorized Service Plan" (service plan). The service plan is a four-page chart that notes for each of several defined activities the "time estimate" for that activity, "considerations" for that activity, and finally, the department's determination of how often and for how long the recipient will receive assistance for that activity.[4]

---

**1.** 7 Alaska Administrative Code (AAC) 43.750(a) (2007).

**2.** 7 AAC 43.750(c); 7 AAC 43.751.

**3.** The meaning of the numbers varies with different categories of information. For example, in Section A ("Professional Nursing Services") '0' means that the indicated "[c]ondition/treatment [was] not present in the last 7 days" while '3' means that it was present "5–6 days a week." Alternatively, in Section C4B ("Cognition") '0' means "Can recall details and sequences of recent experiences and remember names of meaningful acquaintances," while '3' means "Cannot

recall entire events or names of spouse or other living partner even with prompting." Generally speaking, a '0' is better; higher numbers indicate poorer health or greater need of assistance for the given activity.

**4.** For example, the activity "bathing" is defined as "How person takes full-body bath/shower, sponge bath, transfers in/out of tub/shower. (EXCLUDE washing of back, hair)." The time estimate for bathing is "15–30 minutes," and considerations include "If shower used and shampoo done, then consider as part of activity[], assistive devices for independence." The particular recipient described in the example

The PCAT was adopted in April 2006.[5] In the nine months that followed, the personal care needs of over 1,000 PCA service recipients were reassessed using the PCAT. On the basis of those assessments, the services of 901 individuals were reduced, and 102 were terminated. As to sixty-five others, the department was uncertain whether their services were being increased or decreased, "because the old service plans [were] not available for comparison."

## B. Notice of Reduction of Benefits

The department drafted form letters to notify affected PCA service recipients that their services were to be either terminated or "reauthorized." Among other things, the reauthorization ("reduction"[6]) notice stated that new regulations had been implemented requiring all recipients to be reassessed by the standardized PCAT; explained that the assessment "will be the basis upon which a service plan will be developed"; reminded recipients that a state contractor had met with them to assess their needs using the PCAT; and informed recipients that, "[a]s a result of the needs identified in the PCAT and ... review of other supportive documentation, the [state] has approved a service plan authorizing [service recipients] to receive [X] hours per week of personal care services." The notice summarized the services that would be provided and referenced the detailed service plan, which was attached.

## C. Proceedings

In August 2006 two individuals who had received notices that their services were being reduced or terminated filed a class-action lawsuit. Carmen Baker and Catherine Burtness (collectively "Baker") alleged that the department's notices violated procedural due process because they "failed to convey criti-

cal and necessary data" that would allow the recipients to appeal the department's determination. Baker requested a temporary restraining order and preliminary injunction requiring that the department (1) re-serve all class members with due process compliant notices; (2) stay upcoming administrative hearings; and (3) reinstate the PCA benefits of all recipients who received defective notice that their services were to be reduced or terminated.

During pendency of this litigation the department revised the notices, though without conceding that they were in any way deficient. The termination notice was substantially altered, but the department made only minor and insignificant adjustments to the reduction notice at issue here.[7] The revised notices were issued after October 12, 2006. Approximately 647 individuals received the original reduction notices issued prior to that date.

The court granted Baker's motion, but only as to those individuals who had received the original, unrevised termination letter issued prior to October 12, 2006. It held that, while the revised notices (both termination and reduction) complied with due process, the "old version" of the termination letter was insufficient; "it lack[ed] any specific information concerning the PCA recipient's personal evaluation or PCAT calculation, giving the letter's recipient very little direction as to whether to proceed with their appeal." As to the reduction letters (both the original and revised versions) and the revised termination letters, the court held that they were "sufficient in this regard."

Baker filed this petition for review on February 12, 2007. Asserting that the original reduction notice, like the termination notice, did not comply with due process, Baker asks that we overturn the superior court's denial

---

was allotted thirty minutes per day, seven days per week for a total of 210 minutes per week of bathing services.

**5.** 7 AAC 43.751.

**6.** Throughout this litigation, the parties refer to the reauthorization notice as a "reduction" notice, but neither "reduction" nor any similar words are anywhere on the face of the notice; it

states only that services have been "authorized." For simplicity, we will continue to refer to the notice as a "reduction notice," recognizing, however, that the state would prefer not to characterize it as such.

**7.** Specifically, the department "deleted the recitation of the minutes approved at the bottom of page 1 and the top of page 2. Second, [it] included a new 'box' at the top of the letter for administrative purposes."

of injunctive relief for those who received the original reduction notice. Specifically, Baker asserts that the reduction notices "fail to explain, in any understandable way, the standards and methodology used by the State in reaching its ultimate decision to reduce recipients' PCA benefits." Additionally, Baker argues that the notice is misleading. The department did not oppose this court's consideration of Baker's petition, and we granted it.

## III. STANDARD OF REVIEW

■ The parties agree that state action reducing the benefits at issue here invokes procedural due process concerns.[8] Whether the department's original reduction notice complied with due process presents a question of constitutional law which we review *de novo*, adopting the most persuasive rule of law in light of precedent, reason and policy.[9]

## IV. DISCUSSION

### A. Due Process Requires that the State Provide the Reason for Its Action.

In *Goldberg v. Kelly*[10] the United States Supreme Court held that to satisfy constitutional due process an agency contemplating a termination or reduction of public assistance benefits must provide the recipient "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend."[11] The underlying policy rationale is that recipients of public assis-

tance benefits should be afforded a degree of protection from agency error and arbitrariness in the administration of those benefits.[12] These constitutional mandates have been embodied in the federal and state regulations governing administration of the Medicaid program, which, among other things, require that a notice provide the "reasons for the [agency's] intended action."[13]

■ Baker argues that the department has failed to meet this requirement because the notices do not show the "methodology, standards, or calculations" that the department used to determine benefits. The department responds that considering the state's interaction with the recipients before it sent the letters and the information included in the letters, "recipients had notice of the state's revised assessment tool, the information on which the assessment was based, and the reasons for the state's determination of the level of benefits they were entitled to receive."

■ As a preliminary matter, we reject the suggestion that "notice" here can be broadly construed to include not only the written letter, but also the "information the recipients already had about the assessment process and the information the recipients already had about themselves." The department urges us not to "evaluate the letter in a vacuum," but although the Constitution arguably allows for a broad construction of "notice,"[14] the federal regulations applicable here do not: Section 431.201 defines "notice"

8. *See Goldberg v. Kelly*, 397 U.S. 254, 261–62, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

9. *See Green Party of Alaska v. State*, 147 P.3d 728, 732 (Alaska 2006); *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004).

10. 397 U.S. 254, 90 S.Ct. 1011, .25 L.Ed.2d 287.

11. *Id.* at 267–68, 90 S.Ct. 1011.

12. *See Banks v. Trainor*, 525 F.2d 837, 842 (7th Cir.1975).

13. 42 C.F.R. § 431.210(a)-(e) (2007) (requiring that notices issued in the administration of the federal Medicaid program provide (1) a statement of what action the department intends to take; (2) the reasons for the action; (3) the specific regulation supporting the action; (4) an explanation of the individual's right to request a

hearing; and (5) an explanation of the circumstances under which the benefit is continued if a hearing is requested); *see also* 42 C.F.R. § 431.206; 7 AAC 49.070.

14. *See Goldberg*, 397 U.S. at 268, 90 S.Ct. 1011. In that case, "notice" amounted to a letter from the agency and a personal meeting with a caseworker. The Court did not describe the contents of the letter, but it saw no "constitutional deficiency in the content or form of the notice" and was satisfied that the recipient was adequately informed of the "legal and factual bases" for the agency's position. *Id.* The Court added that "this combination [of a written letter and a personal meeting] is probably the most effective method" of providing notice to the recipient. *Id.; see also Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir.2005) (holding that due process does not specifically require "notice to come in just one letter, as opposed to two").

as "a *written* statement that meets the requirements of § 431.210."[15] Further, we agree with diverse authorities holding that although an agency may have latitude to provide notice by a variety of media under *Goldberg*, the agency must actively provide "complete" notice[16] and should not "improperly place[ ] on the recipient the burden of acquiring notice[;] due process directs [the agency] to supply it."[17] For these and other reasons,[18] we hold that the department cannot presume that recipients already have a basis for understanding why services are being reduced; whatever information the department is required to provide must be part of the written notice itself.

### B. To Satisfy Due Process, the Notice Must Show How and Why the Department Determined that a Reduced Level of Benefits Was Warranted.

Beyond establishing that adequate notice must "detail[ ] the reasons" for a proposed termination of benefits, *Goldberg* does not specify what information the notice must provide to satisfy due process.[19] The obvious challenge for any court applying *Goldberg* is

to determine what level of detail is required. As a first step, many courts have invoked the balancing test set forth in *Mathews v. Eldridge*[20] to consider what burden can reasonably be placed on an agency to eliminate the risk of erroneously depriving an individual of a benefit in light of the value of that benefit to the individual.[21]

Where the recipient has a "brutal need"[22] for the benefit at issue, as in the case of welfare recipients, courts have traditionally required that agencies go to greater lengths—incurring higher costs and accepting inconveniences—to reduce the risk of error.[23] Recipients of PCA services are arguably as dependent on their benefits as are welfare recipients; without them, they may be unable to do things as basic as bathing, preparing a meal, or using the toilet. An error in the agency's determination to reduce PCA services could result in serious harm to the service recipient. It follows that the agency should be required to make every reasonable effort to reduce the risk of erroneously depriving PCA services recipients of their benefits.[24] In the context of notice, such effort might amount to erring on the side of providing too much detail respecting

**15.** 42 C.F.R. § 431.201 (emphasis added).

**16.** *Ortiz v. Eichler*, 616 F.Supp. 1046, 1062 (D.Del.1985).

**17.** *Schroeder v. Hegstrom*, 590 F.Supp. 121, 128 (D.Or.1984) (quoting *Philadelphia Welfare Rights Org. v. O'Bannon*, 525 F.Supp. 1055, 1061 (E.D.Pa.1981)); *see also Vargas v. Trainor*, 508 F.2d 485, 489 (7th Cir.1974). In *Vargas*, the agency argued that the notice sufficed because it invited the recipient to seek additional information; the court rejected this, stating that the notice recipient "would be unable or disinclined, because of physical handicaps and, in the case of the aged, mental handicaps as well, to take the necessary affirmative action." *Id.* The court was further concerned that, given the "human tendency" to presume that an action taken by a government agency is correct, "many of the mistakes that will inevitably be made will stand uncorrected." *Id.* at 490; *see also Schroeder*, 590 F.Supp. at 127–28 (citing *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir.1980)).

**18.** For one, in the case of Petitioner Burtness, nearly three months elapsed between her personal assessment on May 19 and issuance of notice on August 11. Further, the assessment meeting does not afford protection against agency errors

as the recipient is not given the opportunity to review the completed PCAT for obvious misinterpretations, misunderstandings, or clerical errors.

**19.** 397 U.S. at 267–68, 90 S.Ct. 1011.

**20.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**21.** *Id.* at 334–45, 96 S.Ct. 893; *see also Schroeder*, 590 F.Supp. at 128–29.

**22.** *Goldberg*, 397 U.S. at 261, 90 S.Ct. 1011.

**23.** *See Schroeder*, 590 F.Supp. at 128–29 (citing several cases, including *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir.1980); *Vargas v. Trainor*, 508 F.2d 485, 489 (7th Cir.1974); and *Philadelphia Welfare Rights Org. v. O'Bannon*, 525 F.Supp. 1055, 1061 (E.D.Pa.1981)).

**24.** *See Goldberg*, 397 U.S. at 261, 90 S.Ct. 1011 (holding that "extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss" and noting recipient's "brutal need" for the services at issue); *Ford v. Shalala*, 87 F.Supp.2d 163, 182 (E.D.N.Y. 1999) (holding that even "substantial governmental burden"—expensive information gather-

the basis for the agency's decision rather than too little.

■ Citing *Ford v. Shalala*,[25] Baker asserts that to meet this high standard the notice "must explain the formula by which the benefit amount was calculated, identify the underlying facts upon which the calculations were based, and include a breakdown of the sums attributable to each factor in the equation" so that benefit recipients can "check the factual [and] mathematical accuracy of [the] intended action."[26] We agree that decisional law strongly supports the position that "due process requires an explanation of the *specific* reasons for reducing ... benefits."[27] Although some courts have upheld notices that failed to set forth the calculations used by an agency to determine a reduction of benefits,[28] these cases can be distinguished,[29] and the higher standard in *Vargas* should govern here.[30] That is, to the extent feasible, the department should be required to show how and why it determined that a reduction in PCA services was in order.

The department does not dispute that the *Shalala* standard applies where "numerical calculations are critical to the determination of eligibility or benefit amount." But it argues that *Shalala* is inapplicable here because there are no numerical calculations to show; rather, the department asserts, its

analysis is subjective—a "personal assessment of human capabilities." The final product of the department's assessment is the service plan, a line-item allotment of service-minutes to various activities. The department claims that these final numbers are a result of applying "standards"[31] to information provided by the individual, a process that "requires some element of human judgment," not a calculator.

While it is true that the department is not working from a strict mathematical formula, it must still comply with the spirit of the law, which requires that it be as transparent as possible in its methodology. Despite some subjective elements in the department's decision making, we agree with Baker that due process demands that recipients facing a reduction of their public assistance benefits be provided a meaningful opportunity to understand, review, and, where appropriate, challenge the department's action. The state must do more than it has done to ensure that recipients have the information they need to understand and, if necessary, to challenge the state's action concerning their benefits.

## C. Inclusion of the PCAT Form with the Notice Would Satisfy Due Process.

■ To the end of providing sufficient detail to satisfy due process, Baker requests

---

ing and processing system overhaul and computer reprogramming that would take up to two years to implement—must be met in order to provide specific reasons where government proposed terminating or reducing recipient's SSI benefits). *See also Vargas*, 508 F.2d 485 (holding notice inviting benefits recipients to seek additional information insufficient where recipients were often unable, by virtue of physical or mental handicaps, to take necessary affirmative action).

**25.** 87 F.Supp.2d 163.

**26.** *Id.* at 178 (citations omitted); *see also Dilda*, 612 F.2d at 1057; *Banks v. Trainor*, 525 F.2d 837, 841–42 (7th Cir.1975).

**27.** *Schroeder*, 590 F.Supp. at 128 (emphasis added) (citing *Vargas v. Trainor*, 508 F.2d 485 (7th Cir.1974)).

**28.** *See Garrett v. Puett*, 707 F.2d 930, 931–32 (6th Cir.1983) (declining to follow the decisions of the Seventh Circuit in *Vargas, Dilda,* and *Banks* ).

**29.** Courts have "easily distinguished" *Garrett* and cases similarly adverse to *Vargas* on the basis that they address across-the-board changes based on changes in state or federal law, not the reduction or termination of benefits "on an individual, case-by-case basis." *Ortiz v. Eichler*, 794 F.2d 889, 894 (3d Cir.1986) (distinguishing *Garrett*, 707 F.2d 930); *Schroeder*, 590 F.Supp. at 129 (distinguishing *Garrett*, 707 F.2d 930). *Garrett* is also distinguishable in that the statute there only required consideration of an additional factor in the computation, whereas in the Seventh Circuit cases, the very method of calculating benefits was changed. *See, e.g., Banks*, 525 F.2d at 839 (noting that the "income method" of calculating benefits replaced a method which was based on a percentage of the food allowance for an individual household).

**30.** *See supra* note 17.

**31.** The department claims the only standards it uses are clearly indicated on the service plan, referencing the "considerations" that factor into the assessor's determination of how many minutes to allot to each activity.

that the department provide a copy of the recipient's PCAT form—by all accounts the "basis upon which a service plan [is] developed"—with the notice. At oral argument, the department conceded that this is "simple for the state" to do and noted that it was already doing this. But the department argues that due process does not *require* inclusion of the PCAT so as to invalidate those notices that were sent without it. It also asserts, without explanation, that to require inclusion of the PCAT would be an undue burden on the department and that the information provided by the PCAT would not assist a recipient in preparing an appeal.

 Whether due process requires the department to provide notice recipients a copy of the PCAT form turns on whether the information provided in the form (1) played a role in the assessor's determination of how many hours of service should be authorized; (2) would assist the recipient in understanding why service hours were being reduced; (3) would enable the recipient to review the agency's assessment of his or her needs; and (4) would assist the recipient in preparing a meaningful defense in the event that he or she wishes to appeal the agency's determination.[32]

The PCAT is the critical document translating the raw information provided by the individual to authorized hours of PCA services. The assessor asks questions of the individual and "codes the response to each question" with a number value. The assessor then "uses [these numbers] to score eligibility for PCA services" and "may refer to the numbers" to determine the amount of benefits to provide. The department asserts that the numbers on the PCAT are merely "shorthand" symbols representing the extent to which the individual is able to perform a given activity independently. But it is clear that the number assigned to each question reflects the assessor's attempt to distill raw and sometimes subjective information into standardized form. The department itself notes that the model assessment tool from which the PCAT was derived provides "an accurate foundation for measuring the social, medical, and nursing needs of an individual."

Moreover, the department concedes that the legislative mandate that led to the development of the PCAT was to assess individuals "according to uniform measures." The department refers to the PCAT as a "scoring sheet[ ]." Regardless of whether the numbers are mere code or shorthand, it is apparent that they have a degree of influence on the ultimate amount of service hours allotted to the individual. There may not be a mathematical formula per se, but the PCAT is the department's best effort to reduce subjective information—the "acuity of the assessor"—into objective form. The PCAT clearly plays a significant role in the final determination.

The department asserts that the PCAT would not provide recipients with information "that would contribute to their decision whether to request, or how to prepare for, a hearing." We disagree. It is true that if a recipient disputes, for example, that fifteen minutes, twice a day is sufficient time to prepare necessary light meals, she can request a hearing based on nothing more than her belief that the agency has underestimated the time that it takes to make a sandwich on her service plan. But if the recipient wishes to appeal the reduction of hours generally, it would be helpful to understand the basis for the agency's determination, and this cannot be gleaned from the service plan alone. The PCAT provides insight into what the assessor understood of the individual's abilities and disabilities, and while this information may not be necessary to perfect an appeal to the agency, it may well contribute to the recipient's decision to initiate one.

The goal of the assessment process is to take raw information from the service recipient and translate it into hours of service needed. This requires analysis, and it follows that documentation of that analysis, to the extent that it exists, should be provided to the recipient. It may be that the PCAT is only a part of that analysis, but it is a critical component, and the department has not advanced a compelling argument for why it should not include the PCAT or otherwise provide the information that it used to determine the numbers on the service plan. If the

---

**32.** *See, e.g., Ortiz,* 616 F.Supp. 1046, 1062 (D.Del.1985).

only burden is an administrative one, the cost and inconvenience of copying the PCAT and attaching it to the notice is not unreasonable under the circumstances here.

## V. CONCLUSION

We REVERSE the superior court's holding that the reduction notices at issue comply with due process and REMAND for further proceedings consistent with this opinion.